UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR04-00229-RMT |
| Plaintiff, | ) | ORDER RE: DEFENDANT'S |
| | ) | MOTIONS TO DISMISS |
| vs. | ) | INDICTMENT FOR |
| | ) | OUTRAGEOUS GOVERNMENT |
| DAVID STRUCKMAN, | ) | MISCONDUCT AND |
| | ) | UNNECESSARY DELAY |
| Defendant. | ) | |
| | ) | |

This matter has come before the court on the motions by defendant David Struckman ("defendant") to dismiss the indictment for outrageous government misconduct and for unnecessary delay in the trial procured by government misconduct. The court, having considered the record herein, including the pleadings, testimony and other evidence in this matter, finds as follows:

### Procedural Posture

On May 11, 2004, defendant David Struckman was indicted in the Western District of Washington for conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

On July 20, 2005, a superseding indictment was filed, alleging nine counts of tax evasion under 26 U.S.C. § 7201 for the years 1999-2001 (Counts 2 through 10), in addition to the previously charged one count of conspiracy to defraud the United States

1

in violation of 18 U.S.C. § 371 (Count 1).  The superseding indictment alleges that defendant founded an organization called Institute of Global Prosperity ("Global Prosperity") which received $40,000,000 during its existence and that defendant Struckman himself received $5,100,000 reportable income via nominee bank accounts.

On May 24, 2007, defendant filed a motion to dismiss the indictment for outrageous government misconduct, Dkt. 361, and on May 10, 2007, defendant filed a motion to dismiss the indictment for unnecessary delay in the trial procured by government misconduct.

From July 9 through July 11, 2007, the court held an evidentiary hearing on defendant's motions.

### *Factual and Procedural Background*

I. **Anonymous Informant 1 ("AI-1"), also known as "Ted."**

Sometime in 2000, Keith L. Chinn, then a Special Agent with the United States Department of Treasury, Internal Revenue Service ("IRS"), was assigned to the David Struckman Global Prosperity investigations.  As part of the assignment, Special Agent Chinn ("SA Chinn") was assigned "to do some background information on" the defendant.  1 Transcript of Proceedings ("TP") 263:16-18.

On August 7, 2000, SA Chinn sent a message by electronic mail ("e-mail") to Larry R. Bateman, the Supervisory Special Agent at the Seattle Field Office of the IRS. In the e-mail, SA Chinn states:

Larry,

Please tell the boys that I need them to be available for trash runs and surveillance during the next two or three weeks, this is high priority as we need pc for the anticipated warrants, thanks.

Def.'s Ex. 221, AGT 015C[1]

_____

[1] Unless otherwise stated, all references to exhibits are to those exhibits admitted into evidence during the evidentiary hearing conducted in this case on July 9-11, 2007.

In turn, Supervisory SA Bateman forwarded the e-mail to SA Michael D. Hardaway ("SA Hardaway") and Robert D. Manning ("SA Manning"), adding "I think you are the boys that Keith is referring to . . . if there are conflicts give me a heads up as soon as possible." *Id.*

According to SA Chinn's rough notes, on  September 13, 2000, SA Chinn met with a person Chinn designated as "anonymous informant 'Ted.'" Def.'s Ex. 1(B). According to the notes, Ted informed SA Chinn that, among other things, co-defendant Dan Anderson lives in Boston; that Struckman has had four wives; that Struckman bought a two bedroom home and two acres in Issaquah, Washington for $600,000, in the name of a trust and that Struckman "has a deal with a Canadian company to attach a lien so that nobody can attach the house;" that there is a "private vault in Bellevue with 40K gold;" and although Struckman has no kids with Laura J. [Struckman], Laura has a daughter called "Galadriel Imbler," and proceeded to give SA Chinn her address and phone number.  According to the rough notes, Ted gave SA Chinn the name and address of a bank in Panama, as well as an account number at such bank.[2] *Id.*

According to SA Chinn's rough notes, SA Chinn had a contact with Ted on September 15, 2000, where Ted told SA Chinn, among other things, that the "record keeper is the daughter J.J.," gave Chinn JJ's address and the license plate number of a "blue van," and told SA Chinn that a Michael Bovee is Rachel's husband.  Def.'s Ex. 2(B).  The Memorandum of Investigation ("MOI") generated the same day as the contact reflects the same information as the rough notes except it makes no reference to a blue van. Def.'s Ex. 2(A).

SA Chinn's rough notes dated September 18, 2000, in addition to web sites, addresses, phone numbers and e-mail addresses, contain the following remarks:

- Chase Manhattan Bank - Trust for trading stocks.

---

[2]  The MOI of that meeting indicates the bank a account was used by either "Struckman or his daughters."  Def.'s Ex. 1(a)

1    - Struckman 3-1 Trust thing 17,000

2    swift: Chase US 33 ABA:021-000-021

3    - Chase Manhattan has lots of ATMs

4    - got password went behind the net

5  Def.'s Ex. 3(B).[3]

6         According to SA Chinn's rough notes dated September 21, 2000; November 8,

7  2000; November 13, 2000; November 15, 2000; November 27, 2000; November 30,

8  2000; December 11, 2000 and January 25, 2001; each beginning with the notation

9  "Ted", SA Chinn obtained detailed information concerning defendant's personal

10  information, that of his family, and information concerning his activities.  Among the

11  information obtained and recorded on these rough notes, SA Chinn noted Laura

12  Struckman's Social Security Number; defendant's e-mail address; Jennifer Struckman

13  as the contact person; Struckman's use of his mother's maiden name; Struckman's use

14  of other names; Laura Struckman's purchase of  an embroidery shop; a Social Security

15  Number for a Jacob or Jake Wininger; a Social Security Number for Jennifer; a Social

16  Security Number for a Mike Bovee, married to Rachel; references to Jacob Wininger's

17  child support problems; license numbers for vehicles at defendant's residence;

18  information concerning houses bought by defendant; references and locations to safe

19  deposit boxes; Jennifer's plans to move to a new house and the address of the new

20  house; possible names of trusts.

21         SA Chinn's rough notes dated November 20, 2000 contain the following remarks:

22    - She called the cops, ran the plates

23    - white mid-van

24    - Main Drag

25

26    ───────────────────

27    [3]  Although the rough notes do not indicate a source for this information, subsequently,

  when the MOI is prepared apparently on January 28, 2001, the information is then attribute to

28  Ted.

1    - Followed by van

2    - went down to boat to get light at boat.

3    - not doing this any more

4    - gave back endorsement stamps & deposit books

5    - Bus goes mid the house to pick up the records ["records" stricken over]

6    - Thinking having to do with Jake and his prior kid.

7    Def.'s Ex. 8(B).[4]

8         On December 11, 2000, SA Hardaway sent SA Chinn an e-mail titled

9    "STRUCKMAN Surveillance Logs and Memoranda."  In the e-mail, SA Hardaway

10   stated:

11   Keith:

12   I have surveyed the case files you have given me, however, I have yet to see

13   anything regarding the extensive surveillance activity re STRUCKMAN.

14   Can you either show me where the info is, or provide to me as soon as

15   possible.

16   Thanks.

17   Def.'s Ex. 221, AGT-193.

18        SA Chinn replied to the e-mail by saying "I have the field note (sic) but need to

19   put them into usable form."  *Id.*

20        On January 11, 2001, SA Jeffrey Holm sent SA Hardaway an e-mail titled "S.W.

21   Affidavit."  In the e-mail, SA Holm stated:

22   Mike -

23   Can you email your latest updates to the S.W. affidavit at the end of Friday

24   (tomorrow) - I would like to work on the affidavit on Saturday and Patrick

25

26       [4]   Although the rough notes do not indicate a source for this information, subsequently,

27   when the MOI is prepared apparently on March 30, 2001, the information is then attribute to

28   Ted.

1    has asked that I email him the affidavit during the weekend.

2    I still need the following from you . . .

3    1. Description of Struckman and Wininger's residences.

4    2. Results of trash runs at Struckman and Wininger's residences.

5    3. Results of surveillance done on Struckman (and Wininger if appropriate)

6    to include him going to the bank, lack of a 9-5 job, and vehicles he is driving

7    (and anything else of note).

8    4. Information on assets owned by Struckman, including automobiles etc.

9    Patrick is asking for there to show lifestyles and therefore possible taxable

10   income.

11   5. Also, Patrick would like to have someone summarize the info that Keith's

12   CI is telling him.  I've got quite a bit to do myself, so can you sit down with

13   Keith and have him detail the dates of his conversations w/the CI, what the

14   CI had told Keith and how the CI knows this information.  If you can get

15   Keith to write this up for you, so much the better, but since you are the case

16   agent on Struckman I'm passing this job to you.

17   Let me know if you have any questions or need any help.  Thanks.

18   Def.'s Ex. 221, AGT-194.

19   In an entry to his Agent's Diary, dated January 17, 2001, SA Hardaway noted:

20   "Trash run attempt.  Pen register and trap and trace.  Informant info from SA Chinn."

21   Def.'s Ex. 221, AGT-259.

22   Two sets of rough notes dated January 25, 2001 were introduced at the July 2007

23   evidentiary hearing.  Def.'s Ex. 12(B).  The first set of notes, under the heading "KC,

24   MH, 'Ted,'" contains, among other things, the following information:

25   - Laura in Hawaii

26   - Prostep - Struckman [unintelligible] getting $25,000/month

27   - Last conversation was with J.W. and Struckman was there

28   - Web site GPMG set up in Sweden

6

1    - Struckman said he doesn't even have to work another day in his life

2    - Struckman rented a big house in (sic) Issaquah Highway 900

3    - Jennifer gets income from D.S.

4    - Jennifer renting the house from lady in Bellevue

5    - Called the fedex "the happy truck"

6    - Sounds like 3 bank accounts

7    - Advantage Consulting could be an account.

8

9    Def.'s Ex. 12(B), AI1-017-019

10       The second set of notes, under the heading "Chinn, Hardaway, Ted," contains,

11   among other things, the following information:

12       Prostep 25,000/ month parts from Global to Prostep

13       Struckman is con, ripping people off, greedy sob

14       2 bedroom acreage 3 pieces of property, renovating architect

15       Foreign bank accts, debit cards offshore, gold Belize

16       3 Trusts

17       Millionaire "Doesn't need to work another day in my life"

18       Aviary, $14 parrot, $4 Elton John Bin

19       Jennifer still doing, gets mail banking, keep documents out of home

20       Rachel not into it, Boove looser, kissing Dave's butt

21       Jacob ex-painter, deadbeat

22       Jennifer not [unintelligible] convinced, turned on a dime when thought

23       followed

24       Bill Konlin Atty

25       Large amts of cash occasionally come to home

26       Tony, Michelle's & Dave's kid

27       Computer equipment, spamming e-mail to

28       Jennifer weeding, Issaquah house

1    Jennifer goes to dad's house a lot for business

2    CBS 48 hours, 3-4 more segments, govt behind it

3    Talk to Laura, Hawaii Maui

4    Jennifer gets paid by Dave for

5    3 endorsement stamps

6    Offshore seminar 2-3 months

7    Aruba, Belize, Cancun

8    Alternate Ventures

9    Crescent Moons

10   Advantage Consultants

11   Def.'s Ex. 12(B), AI1-020-022

12       In an entry to his Agent's Diary, dated January 25, 2001, but recorded on January

13   29, 2001, SA Hardaway noted: "Meeting with anonymous info source.  Analysis of

14   evidence/info and affidavit."  Def.'s Ex. 221, AGT-263.

15       On February 11 and 15, 2001, SA Holm received instructions via e-mail, to

16   change parts of a proposed affidavit.  Def.'s Ex. 221, AGT-110-14.  Holm was

17   instructed that "[i]f we know of criminal records for the CI's (sic) they must be

18   revealed.  If we know how the anonymous Informant receives his information (does he

19   personally witness, get it from statements, etc. we must put it in)," and to "review the

20   trash updates prepared by Hardaway."  *Id.*

21       On February 23, 2001 and February 28, 2001, search warrants were issued to

22   search the residences of David Struckman, Jeniffer Wininger, Struckman's daughter,

23   and other premises.  August 31, 2004 Order to Unseal Search and Seizure Warrants and

24   Applications and Affidavits for Search and Seizure Warrants, Dkt. 70.

25       On or about February 28, 2001, defendant Struckman was served with a grand

26   jury subpoena for documents.  Gov't Brief in Support of Evidentiary Hearing ("Gov't

27   Brief"), Ex. 2.

28       A MOI dated March 13, 2001 by SA Hardaway for the first time memorializes

1    SA Hardaway's contact with Ted, whom SA Hardaway refers to as Anonymous

2    Informant 1 ("AI-1").  The MOI states, in part:

3         Special Agent Michael D. Hardaway was contacted, by telephone, by an

4         anonymous informant (AI-1).  SA Hardaway spoke with AI-1 regarding

5         DAVID A. STRUCKMAN (STRUCKMAN) and associates, and GLOBAL

6         PROSPERITY (GLOBAL).  AI-1 has previously provided information to

7         C[rimina] I[nvestigation] regarding STRUCKMAN and associates, and

8         GLOBAL.

9    Def.'s Ex. 13 (emphasis in original).

10        The MOI describes, among others, defendant's reaction to the search warrants

11   and the grand jury subpoena, including the name of the attorney defendant contemplated

12   hiring.

13        On March 14, 2001, Supervising SA Bateman sends SA Hardaway and Chinn an

14   email titled "Ted," which states:

15        Definition of an anonymous informant and guidance for recordation of

16        informant contact.  I would like all contacts written up in MOI format.  For

17        purposes of the MOI use the name given by the informant "Ted."  Also I

18        would like him encouraged to become a Confidential Informant so we have a

19        degree of control and the ability to contact him.  If this is not possible we

20        will continue the anonymous designation but will properly document all

21        contacts.

22   Def.'s Ex. 219 (with a document attached to the e-mail).

23        Subsequent to the May 14, 2001 e-mail from Supervisory SA Bateman

24   concerning "Ted," SA Hardaway produced MOIs dated the same day as the rough notes

25   for nineteen contacts with Ted, whom SA Hardaway now calls "AI-1."  Def.'s Ex. 15-

26   33.  The MOIs span from April 17, 2001 through December 12, 2001 and contain

27   detailed information on both defendant himself and defendant's family, including

28   information on defendant's daughters, Rachel Struckman Moritz and Jennifer Wininger;

9

and his daughters' significant others, Mike Bovee and Jacob Wininger, respectively.
On one occasion, SA Hardaway stated AI-1 provided the Social Security Number and
address of Jacob Wininger's mother.  Def.'s Ex. 33(A).  The information on the MOIs
and rough notes also include reaction to grand jury appearances by defendant and
Jennifer Wininger, reaction to subpoenas by family members, Social Security Numbers,
addresses to residences, expenditures, phone and fax numbers, transfer of funds, and
arguments and marital problems among the family.

On December 17, 2001, SA Hardaway sent an e-mail to SA Chinn, stating:
"Keith, I am being asked, by the attorneys, to produce all memos regarding information
provided by "Ted."  Now might be a good time to finally finish those memos."  Def.'s
Ex. 221, AGT-228.

SA Hardaway prepared two more MOIs concerning AI-1, one dated January 3,
2002 and another dated January 8, 2002.  Def.'s Ex. 34, 35.  Both MOIs referred to
information concerning an internet website, and the latter mentions Jennifer and Jacob's
attempts at reconciliation.  None of the MOIs prepared by SA Chinn concerning "Ted"
are dated as prepared after SA Hardaway's December 17, 2001 e-mail.  The last MOI
attributing information to AI-1/Ted is dated January 8, 2002.  Def.'s Ex. 35.  There are
neither rough notes nor MOIs for any of the additional information the government
attributes to Ted after the January 8, 2002 MOI, including information as to defendant's
whereabouts in Panama from 2004 through 2006.

**II.  Dave Bowden**

A MOI by SA Hardaway indicates that SA Hardaway contacted Dave Bowden
("Bowden") at his residence, located at 18613 108th Avenue Southeast, Renton,
Washington, 98055.  Def.'s Ex. 43.  According to the MOI, the contact occurred on
Saturday, December 21, 2002.  According to the MOI, Bowden "operated a detail
shop/business out of his residence" and met Struckman around 1996 when Bowden
detailed several of defendant's vehicles.  *Id.*  In addition to detailing vehicles, Bowden
also sold classic vehicles during that time.  *Id.*  Bowden stated that at one point,

Struckman "made a pitch" for Global products, . . . talked about investments and 'never paying taxes again.'" Bowden mentioned that he had "explored" Global products and he and his wife Terri had attended a "Global G1 seminar in Cancun, Mexico." *Id.* The MOI further indicates that:

4.    Bowden states that at the seminar he and is wife quickly realized Global was "a bunch of bunk."

5.    Bowden stated in approximately February 1997 D-Struckman purchased a 1932 Plymouth 4-door "hot rod" from him for $30,000.00.  D-Struckman paid for the transaction with a paper bag stuffed with currency.  Bowden deposited $25,000.00 of the currency in his bank account located at U.S. Bank, Spring Glen branch, and while doing so, he believes a Currency Transaction Report was prepared by the bank.

. . . .

7.    Bowden states D-Struckman talked him into investing the $30,000 he received for the Plymouth sale in some Global sponsored event.  Bowden lost the entire $30,000.00.  Apparently, D-Struckman felt bad about what happened and in February 1998 he gave Bowden a check for the full $30,000.00 to make up for his loss.

. . . .

9.    Bowden stated D-Struckman talked about, and frequently went to, some sort of a safe deposit box vault, in Bellevue, Washington.  This box or vault was not at a bank.

10.   Bowden stated he saw Laura Struckman (L-Struckman) nearly every day at the Spring Glen branch of U.S. Bank, in Renton, Washington, doing banking business.  L-Struckman was frequently withdrawing currency.  Bowden also did his banking at the same branch. . . .

Def.'s Ex. 43

On Thursday, January 16, 2003, SA Hardaway and SA Michael W. Grossman, met Bowden at his residence to "follow-up to an earlier contact conducted by SA Hardaway."  Def.'s Ex. 44.  In addition to stating that Struckman "talked about the 1932 Plymouth as if it were his personal property and under his custody and control," SA Hardaway writes down that:

> D[ave] B[owden] remembers a casual conversation with D[avid]
> S[truckman], probably around early 98, when DS was bragging about
> making big bucks.
>
> Somehow the conversation turned to Laura going to the bank.
>
> DB said DS said he "sent Laura to the bank nearly every day to take out [amt
> 10,000]* in cash.
>
> *9,000 or 9,500, not sure which
>
> DB remembers DS talking about sending bulk cash ($100k) via Fedex to
> destination unknown.
>
> DB and wife Terri went to Dinner one time with DS and LS metropolitan
> grill, Seattle
>
> Tab approx $1,200
>
> DS paid cash.

Rough Notes to MOI dated January 16, 2003, identified as document 53, attached to Government's Request for *In Camera* Review, Dkt. 147.[5]

On February 20, 2003, Bowden testified before grand jury proceedings leading to the indictment of Laura Jean Marie Struckman.  Def.'s Ex. 47.  Bowden testified that both David Struckman and Laura Struckman "walked up to me and handed me a check

---

[5]  While the parties did not include these rough notes as part of the evidence admitted into evidence during the evidentiary hearing conducted in this case on July 9-11, 2007, the rough notes were found to be statements "under the Jencks Act and . . . therefore, required to be produced, if the witness[] or agent[], whose statements are contained therein, are called by the Government to testify at trial."  November 8, 2005 Order, Dkt. 150.

for $30,000" to reimburse Bowden the money Bowden had invested at Struckman's prodding. *Id.* 13-14. Bowden testified that Struckman told Bowden that "Laura was [in the bank] every morning at 9:00 o'clock drawing out $10,000 or 99 – $9,000 a day." *Id.* 18:19-20. Bowden further testified that:

Bowden:      Because I would see Laura at the bank every morning just about, you know, him or her.  I would see him a few times too, but her mostly would get the money.

Counsel:     Did she ever talk about going to the bank?

Bowden:      Yeah.  Yeah.  She would say she was there every day, you know, and Dave told me he would go there even at night with his debit cards and empty out the cash machines.

Counsel:     Anything significant to the amount of money why it was you said under 10,000?

Bowden:      Oh, yeah.  It was because they wouldn't take a record of it. You know, the bank wouldn't –

Counsel:     That's what he told you?

Bowden:      Yeah.  See, I never knew nothing about that.  I would never had $10,000 to put in there, so he told me that you would have to sign a form if you put in any more than that.

*Id.* 18:24 - 19:15.

Counsel:     Did he ever mention anything about shipping money?

Bowden:      Oh, yeah.  Um, well, he told me that he had a safe in the house too and he usually kept 100,000 in the safe.  And he said that they shipped - - they were shipping money. . . .

             But he said that they were shipping money back, at least this is what he told me, and then it would go over to the Bahamas or somewhere, and I don't know if it was Michigan, somewhere

1          back there, Iowa.  I don't know.

2    *Id.* 21:9-13.

3          After government counsel asked if the grand jurors have any questions, a grand

4    juror ("GJ") asked:

5    GJ:          Did Laura ever tell you directly about the $10,000 cash

6                 transaction forms?

7    Bowden:      Not really, the amount.  Dave told me the amount that she went

8                 there every day and got the $9,900 over whatever, you know, at

9                 that time.  And Laura just said she had to go to the bank every

10                day.

11   *Id.* 25:13-18.

12         Bowden testified that the check he had received from Struckman for $30,000.00

13   was written "from a trust, this trust - - this is the one that I noticed was on (sic) his cars

14   later on when I was detailing them." *Id.* 14:25-15:2.

15   Counsel:     Crescent Moon?

16   Bowden:      Because that's when I – after this I started to - - I would detail

17                their cars, and their kids, and his little sidekick would come and

18                have his car done every so often, and that's when I started - -

19                any kind of paperwork I found with names and stuff on it, I had

20                a copy machine at the house, so I started copying stuff.

21                I knew this was starting to be a scam, so I started getting stuff

22                out of their cars and coping (sic) it.  And I gave that all to the

23                detective.  Everything they did was in cash.

24   *Id.* 15:4-12.

25         Upon being questioned by a grand juror about his trip to the Cancun seminar,

26   Bowden testified:

27   GJ:          So did you buy the ticket or did Dave make some arrangement?

28   Bowden:      No, I bought.  I mean Dave actually bought it, it wasn't –

14

| | | |
|---|---|---|
| 1 | GJ: | Dave brought (sic) -- |
| 2 | Bowden: | No.  Well, no, I bought the ticket, but I – I was using the money |
| 3 | | from what he pretty much gave me off the detail.  I figured I |
| 4 | | didn't lose nothing and I can go to Cancun on a vacation. |
| 5 | GJ: | But you just kind of figured out, well, Dave is bringing me so |
| 6 | | much business that I'm really not – |
| 7 | Bowden: | Right. |
| 8 | . . . . | |
| 9 | GJ: | And how much money a month do you figure he was spending |
| 10 | | on just getting those cars detailed? |
| 11 | Bowden: | It varied.  Quite often it went from - - anywhere from 1,000 to |
| 12 | | 2,5000, 3,000. |
| 13 | . . . . | |
| 14 | | And on one – now this – one of the trips that he went on, this is |
| 15 | | after I went to Cancun and I wasn't planning on going on any |
| 16 | | more, . . . he wanted a bunch of work done on [different |
| 17 | | vehicles] And the bill came to a little over $18,000. . . . I was |
| 18 | | the same story . . . took out 18, 000. |
| 19 | Counsel: | Cash? |
| 20 | Bowden: | Cash |

Def.'s Ex. 47 at 16:18-17:5.

Bowden also testified that although he had bought a ticket to a seminar in Cancun, Mexico, he had "already figured it was a scam from here." *Id.* 8:23.

On the same day, February 20, 2003, the grand jury returned an indictment against Laura Jean Marie Struckman charging her with one count of knowingly, intentionally, and unlawfully conspiring and agreeing with an un-indicted co-conspirator to agree to structure, or assist in structuring, a currency transaction for the purpose of evading the reporting requirement a financial institution has to file for each

exchange of currency or other payment which involves a transaction of more than $10,000.  February 20, 2003 Indictment, *United States v. Laura Jean Marie Struckman*, No. 03-0088 (W.D. Wash. 2003).

On May 27, 2003, Bowden testified at Laura Struckman's trial.  Among his testimony, Bowden testified that:

Counsel:    Did Laura Struckman ever tell you about her banking practices?

Bowden:     Well, yeah, during the conversations between her and Dave and me, you know, . . . they'd mention that they'd go down to the bank every day and get under $10,000 because the government wouldn't find out about it.  They wouldn't have to fill out some forms, or something, I don't know.

. . . .

They both mentioned that they did have a banking account or a safe deposit box in Bellevue.

. . . .

Counsel:    What did they tell you they did with that safe deposit box?

Bowden:     Just put money in it, I guess.  You know, other that - - you know, they said they were shipping out a hundred, two hundred thousand dollars at a time in paper bags. . . And it was going back East and down South and Denver, and I don't know where.

2 TP 110:21-24; 111: 3-15, Dkt. 110, *United States v. Laura Jean Marie Struckman*, No. 03-0088 (W.D. Wash. 2003)

On May 28, 2003, Laura Struckman was found guilty of count one.

## III.    Events in Panama

At some time, David Struckman left the United States and went to Panama.

On June 21, 2004, Michael Heineman, Trial Attorney with the Office of Internal Affairs with the Criminal Division of the Department of Justice, sent Timothy W.

1  O'Brien an e-mail.  The e-mail stated:

2      Tim O'Brien:

3          David Wattley told me that your office was working with Panamanian

4  officials to try to have David Struckman expelled from Panama.  At your

5  convenience, could you let Jo Mazurek . . . know by reply e-mail what the

6  outlook is for Struckman being expelled?  If he is not going to be expelled

7  then Jo will need to have a provisional arrest request in place in Mexico but

8  we would rather not do that if it can be avoided.  If you have any questions. .

9  . . Thank you.

10  Def.'s Ex. 89(c).

11      Timothy O'Brien ("O'Brien"), then the regional security officer ("RSO") at the

12  United States Embassy in Panama City, replied:

13      Mike,

14          No Problem.  Dave is right, my office is working the expulsion

15  situation, via our Criminal Investigations Liaison Branch.  What we're

16  hoping to do is find him and have him deported vice going the provisional

17  arrest warrant route.  The reasons for this are simple – a PAW will mean that

18  extradition proceedings begin, and a 60 clock starts to tick here in Panama.

19  There's a Section of the CFR . . . that allows the USG to revoke a passport of

20  an individual who is the subject of an outstanding Federal Felony arrest

21  warrant - - which Struckman has.  We know he's got a U.S. ppt., and if we

22  revoke it he's undocumented.  Which means he's immediately deportable.

23          There's also the possibility that the Panamanians can decide he's an

24  undesirable and revoke his visa (Struckman has a valid Panamanian visa,

25  good until August 2004, and has applied for an investment visa), so we'll

26  have to see at this point.  We just had a meeting with the Panamanian

27  National Police about this case this morning, and provided information that

28  we hope will assist them in finding him, but we'll have to see at this time

1    whether they can. . . .

2  Def.'s Ex. 89(c)

3    On August 25, 2004, the Ministry of Government Affairs and Justice, National

4  Immigration and Naturalization Directorate of the Republic of Panama, denied

5  defendant Struckman's application to change his immigration status in Panama from

6  that of a tourist to an investor.  Resolution Number 10885, Gov't Ex. 12.  In arriving at

7  such decision, the national Director of Immigration and Naturalization took into

8  consideration the arrest warrant issued by the District Court of the Western District of

9  Washington against David Struckman "for the violation of code 18, section 371,

10  conspiracy and fraud before the United States of North America."  Id.

11    On the same day, the same Panamanian authorities issued a deportation resolution

12  against the defendant.   Resolution Number 10886, Gov't Ex. 13.  The Ministry of

13  Government and Justice based its decision, in addition to the pending arrest warrant

14  against the defendant in the U.S., on the finding that reasons of security and public order

15  demanded such action "with the purpose of fighting the delinquency."  Id.  The legal

16  bases for the deportation resolution were grounded on Article 36 and 37 of the Law

17  Decree No. 16 of June 30, 1960.  Thus, defendant Struckman was ordered arrested "for

18  reasons of security and public order" through Resolution 10877 by the same authorities.

19  Resolution Number 10887, Gov't Ex. 14.

20    On June 23, 2005, RSO O'Brien sent SA Hardaway an email, which stated,

21  Mike,

22    . . . I have no idea about timelines.  But based on past fugitive

23  experience, we've  done a turnaround in less than 24 hours.  That's why I'm

24  trying to get as much lined up as possible.  Now, there's lots of jokers in that

25  deck that can derail it – Panamanian Immigration can suddenly decide they

26  want to be obstreperous. . . .He may be able to get a lawyer to slow things

27  down (but that's a big reason we want to move quickly if we nab him – we

28  don't want to give him that chance, especially with that much money

18

1    available to him).  But we're trying to plan for all that. . . . TOB
2    Def.'s Ex. 89(v).
3         On December 20, 2005, Mari A. Aponte, a Trial Attorney with the Office of
4    International Affairs with the Criminal Division of the Department of Justice, sent an e-
5    mail titled "Panama Question: Expulsion: David Struckman" to RSO O'Brien.
6         Greetings,
7         I am writing you to see if you can help me out with a question coming from
8         the Tax Division requesting to find out whether the expulsion order for
9         Struckman was still active.  The Tax Division in (sic) aware Struckman has
10        an investor visa in Panama and would like to know if we can proceed to ask
11        for expulsion.  Please advise.
12        Thank you!
13   Def.'s Ex 89(s).
14        On December 21, 2005, RSO O'Brien replies,
15        Mari,
16            Hmmm, "expulsion."  What we have set up, and still in place, is a
17        revocation letter to be served on Struckman whenever he gets arrested.  This
18        revocation letter will be served by a consular officer, formally revoking his
19        U.S. passport - which technically makes him an undocumented alien in
20        country.  We also have a deportation/expulsion letter from Panamanian
21        Immigration ready to go.  His deportation is strengthened by the fact that he
22        has apparently gotten a Venezuelan passport under a false identity – which
23        we have dutifully passed on to Panamanian authorities.
24            That's the plan as of today.  It's been in place for a while, it's just
25        putting the **habeas grabbus** on him that's holding up executing everything.
26        With luck, we'll have success soon.  TOB.
27   *Id.*  (emphasis added).
28        On December 27, 2005, Mari Aponte responded: "Greeting, many thanks for your

reply.  I'm copying the prosecuting attorney so she can ask questions if any." *Id.*

On January 6, 2006, RSO O'Brien sent a letter to Licenciado Tomas García Tobar, Sub Director of Immigration and Naturalization, whereby RSO O'Brien informed Licenciado García Tobar that David Struckman, a "fugitive required by judicial authorities of the state of Washington" was then present in Panama and using a false identity supported by a false Venezuelan passport.  Def.'s Ex. 57(g).  RSO O'Brien also informed Licenciado García Tobar that the U.S. would revoke Struckman's passport.  *Id.*

On January 11, 2006, the Sub-commissioner Humberto Brid, National Director of Information and Police Investigation of the National Police, informed RSO O'Brien that a  person claiming to be a Venezuelan citizen who could barely speak Spanish but was fluent in English, had been arrested.  Def.'s Ex. 57(h).  Sub-commissioner Brid informed O'Brien that he believed the person arrested could be David Struckman and sent the fingerprints of the person arrested to RSO O'Brien to determine if the person arrested was Struckman.  *Id.*  According to the letter, the police entered and searched the property owned by Michelle Lynn Mollenberg, an American citizen, due to the "frequency of shotgun fires" coming from the property.  *Id.*

On the same day, RSO O'Brien in his response to Sub-commissioner Humberto Brid, stated the fingerprints sent by  Sub-commissioner Humberto Brid corresponded to those of David Struckman, a U.S. citizen.  RSO O'Brien stated it was worth mentioning that Struckman "[had been] sentenced and at this moment is a fugitive of the federal authorities and is [awaiting] to serve his sentence." Def.'s Ex. (57(i).

On January 11, 2006, the United States' Department of State revoked defendant's United States Passport.  Gov't Ex. 16.

Also on January 11, 2006, Attorney Renaldo Millwood filed a habeas corpus petition of behalf of David Struckman before the Supreme Court of Justice of the Republic of Panama.  Def.'s Ex. 59(b).  The petition contended that (1) Struckman had not been informed of the reason for his arrest, (2) no proper authority had issued an

1   order of detention; and (3) that Struckman had been apprehended inside a residence,

2   without an arrest warrant or a search warrant, and without probable cause, thereby

3   violating legal rights under the Constitution of Panama. *Id.*

4       On January 12, 2006, RSO O'Brien sent a facsimile transmition to Mark Odulio,

5   one of the prosecutors in this case. The fax stated,

6           A lawyer for Struckman came sniffing around police HQ this morning, the

7           race has begun the PNP has turned Struckman over to immigration, so

8           they'll refer the lawyer to them some time today.

9   Def.'s Ex. 89(w).

10      On January 12, 2006, the National Director of Immigration and Naturalization,

11  through Detention Number 0036-DMYN, ordered Struckman detained based on his

12  possession of "irregular documents" within Panama and based on a pending detention

13  order emanating from his status as a fugitive of U.S. authorities. Def.'s Ex. 57 (j).

14      On January 13, 2006, at 9:15 a.m., David Struckman signed a preprinted note

15  notifying him of  Detention Number 0036-DMYN. *Id.*   On the same day, Struckman

16  was deported from Panama.

17      On April 4, 2006, in response to the habeas corpus petition filed on behalf of

18  David Struckman, the Supreme Court of Justice of the Republic of Panama found that

19  although it could not rule on the legality of defendant's arrest because he was no longer

20  within Panama, it found his deportation effectuated on January 13, 2006 in compliance

21  with Resolution Number 10886 of August 24, 2004.  Ex. G attached to Gov't Post-

22  Evidentiary Hearing Brief, Doc 436.

23  **IV.  Defendant's Motion to Disclose Identity of AI-1**

24      On November 15, 2006, defendant filed motions to compel disclosure of

25  exculpatory material with respect to relevant records, government witnesses, informants

26  and government cooperators under *Brady v. Maryland,* 373 U.S. 83, 87(1963), and a

27  motion to compel disclosure of *Jencks* material.  Dkt. 242-246.

28      On November 20, 2006, the court ordered government and defense counsel to

1    meet and confer in an attempt to resolve the said motions, and to file a joint statement

2    setting forth (1) the extent to which counsel had resolved said motions and (2) a list of

3    all issues which counsel had been unable to resolve.  November 20, 2006 Order.

4         On December 1, 2006, counsel timely filed their joint status report regarding

5    discovery.  Dkt. 253.  Among the unresolved issues, defense counsel sought the identity

6    of three confidential informants, including the informant otherwise known as

7    "Anonymous Informant 1."

8         On December 8, 2006, the government filed its response opposing disclosure of

9    the identity of AI-1/Ted, stating that "AI-1 is not a confidential informant of the type

10    contemplated"  by *Roviaro v. United States*, 353 U.S. 53, 59-61 (1957) and its progeny

11    "because AI-1 did not directly or indirectly participate with defendant Struckman during

12    the course of the charged criminal activity.  Rather AI-1 was a tipster, and as such AI-1

13    is not necessarily an 'informant' whose identity must be disclosed."  Gov't Consolidated

14    Response to Def.'s Motion to Compel, Dkt. 259, at 8.

15         On January 26, 2007, defendant filed a motion for an *in camera* evidentiary

16    hearing to ascertain whether the identity of unidentified informants should be disclosed.

17    Dkt. 275. Defendant argued, in part, that AI-1/Ted had provided so much information to

18    the government, "from the mundane to the most intimate about Global and Struckman

19    and his family" that unless AI-1 is in a very close relationship with defendant, the

20    government would not have been able to obtain such information but for the use of

21    illegal wiretaps.  Defendant's Joint Reply In Support of Defendant's Motions to Compel

22    Discovery, Dkt. 266 at 11-13.  According to defendant, the identity of AI-1would be

23    relevant to the defense of government misconduct, which could rise to the level required

24    for a dismissal.  *Id.* at 11.

25         On February 7, 2007, finding that the defendant had shown that the identity of

26    AI-1 would be relevant to at least one defense as required by *United States v. Spires*, 3

27    F.3d 1234, 1238 (9th Cir. 1993), the court granted defendant's motion for an *in camera*

28    hearing as to AI-1.  The court therefore ordered the government to produce AI-1 "to

allow the court to examine the basis for the informant's intimate knowledge of defendant's personal matters and his activities."  February 7, 2007 Order at 5, 7.

On February 15, 2007, the government produced for defense counsel, SA Hardaway's rough notes from a January 16, 2003 interview of Bonita Moritz and Gary Moritz.  February 15, 2007 Letter from Larry J. Wsalek and Mark T Odulio to Robert Bernhoft, attached as Ex. A to Def.'s Mot. to Compel Immediate Disclosure of all Exculpatory Material, Dkt. 352.  According to the notes, Mr. and Mrs. Moritz "do not see much of Dave.  They have no idea why Michelle left Dave, nor why Laura left."  Def.'s Ex. 39.

On February 21, 2007, the government filed its *ex parte* request for *in camera* review of materials related to AI-1. Dkt. 303.  According to the government and a MOI from SA Hardaway, on February 20, 2007 at approximately 11:30 a.m, SA Hardaway served a subpoena for the *in camera* hearing on AI- 1, who then told SA Hardaway that AI-1 had fallen off the roof of AI-1's residence and faced "significant medical problems that may restrict his ability to travel."  MOI by SA Hardaway, attached to Gov't *Ex Parte* Request.  At 11:45 a.m. on the same day, AI-1's spouse called SA Hardaway asking for further information after receiving the subpoena and SA Hardaway's business card from AI-1.  *Id.*  At that moment, "SA Hardaway explained the situation to him/her, and reiterated that they needed to secure a letter from one of AI-1's physicians which articulated his/her current medical condition and his/her inability to travel." *Id.* According to SA Hardaway, later that day, at 6:40 p.m., AI-1's spouse called SA Hardaway again to inform the agent that the spouse had been unable to secure a letter from a physician but would try to obtain an appointment with a physician the following morning to examine  AI-1 and thus obtain the letter.  *Id.*

According to SA Hardaway, the following day, on February 21, 2007, the spouse called SA Hardaway to inform the agent the earliest appointment possible with a physician was February 28, 2007 but that the spouse had been able to procure AI-1's Discharge Summary, which detailed AI-1's fall, which the spouse then faxed to the

agent.  *Id.*

      In absence of a letter from a physician, SA Hardaway asked the spouse of AI-1 to write a letter articulating his/her assessment of AI-1's current condition and why he/she feels he/she is unable to travel.  The spouse of AI-1 agreed to do so and subsequently faxed SA Hardaway such a letter. The spouse of AI-1 went on to stress with SA Hardaway that if the information regarding AI-1's medical condition was to become known by defendant Struckman and/or his family, it would in effect disclose the identity of AI-1 to defendant Struckman and/or his family.  The spouse of AI-1 asked that the medical information be withheld from defendant Struckman.

*Id.* at 2.

      On February 23, 2007, after finding good cause as to why AI-1 should be excused from attending the *in camera* hearing and granting a protective order as to AI-1's medical information, the court ordered the government to file, under seal and *in camera*, "a declaration stating the identity of Anonymous Informant No. 1, describing his/her connection to defendant Struckman and how the informant came about his/her knowledge concerning defendant."  February 23, 2007 Order at 2.  The previously scheduled *in camera* hearing was, thereupon, vacated.

      The government failed to file the declaration as ordered.  Instead, on February 28, 2007, the government submitted a document titled Sealed *Ex Parte, In Camera* Declaration Regarding Anonymous Informant No. 1,  Dkt. No. 321.  In a MOI attached to the government's purported declaration, SA Chinn stated:

      During the investigation, I was randomly contacted by an anonymous informant known as "Ted."  During 2000 and 2001, AI-1 contacted me many times.  I documented approximately 13 contacts.

      AI-1 never communicated his identity to me or anyone else with IRS-CI, to my knowledge.

24

1  I never directed any of AI-1s activities, let alone direct him to conduct

2  wiretaps, access personal bank accounts, etc., or anything illegal or

3  improper.

4  MOI by SA Chinn, attached as Ex. B to Dkt. 321.

5      SA Hardaway similarly stated:

6  AI-1 never communicated his identity to me or anyone else with IRS-CI, to

7  my knowledge.  However, there came a point in the investigation, on

8  January 16, 2003, where I confirmed his identity.  AI-1 is Gary D. Moritz

9  Gary D. Moritz is married to David A. Struckman's first wife, Bonnie.

10  Bonnie and David A. Struckman have two children, Jennifer and Rachel.

11  MOI by SA Hardaway, attached as Ex. A to Dkt. 321.

12      The government also provided a statement signed by Gary D. Moritz stating:

13  "I have no recollection regarding any of the information in the attached

14  documents," referring to a questionnaire created by SA Hardaway concerning the

15  information the government asserted AI-1 had provided.  Ex. C.  Finally, the

16  government submitted a brief statement by Bonnie Moritz, stating "I'm sorry but he

17  doesn't have any answers.  He doesn't understand what any [of] this is or what it is

18  for?"  Ex. D.

19      On April 4, 2007, the court issued an order, under seal, finding that the statements

20  submitted by the two agents concerning AI-1 were not declarations and as such, the

21  court was unable to ascertain the trustworthiness of such statements.  April 4, 2007

22  Order, at 4.  The court then ordered the government, one more time, to file "a

23  declaration or other evidence setting forth the identity of Anonymous Informant No. 1,

24  describing his/her connection to defendant Struckman and how the informant came

25  about his/her knowledge concerning defendant" so that the court could carry its

26  mandate, under *Roviaro* and its progeny, to balance the government's interest against

27  the defendant's right to prepare his defense.  *Id.* at 4-5.

28      The government again failed to file the declaration ordered.  Instead, on April 16,

2007 the government filed another document apparently signed by SAs Hardaway and Chinn, stating:

> 3. During the investigation, SAs Chinn and Hardaway were randomly contacted by an information source who wished to remain anonymous.  This source became known as "Ted" and/or "AI-1."  AI-1 never communicated their identity to SAs Chinn or Hardaway, however, there came [a] point in the investigation, on January 16, 2003, when SA Hardaway conclusively learned AI-1s (sic) identity.  AI-1 is Gary D. Moritz.
>
> 4.  Gary D. Moritz is currently married to Bonita Moritz, who was formerly married to David A. Struckman.   Bonita and David had two daughters, Rachel (Bovee) and Jennifer (Wininger), both of whom are now married and have families.  Although Gary D. Moritz never specifically attributed information to a specific source, and neither SAs Chinn [n]or Hardaway inquired as to the source, Gary D. Moritz made comments such as "the girls were here this weekend," that led both SAs Chinn and Hardaway to believe Gary D. Moritz obtained most of the information passed along to the government simply by listening to conversations during family gatherings, and telephone conversations between Bonita and Jennifer or Rachel.  It is also the recollection of SAs Chinn and Hardaway that Gary D. Moritz may have had personal contact on a few occasions with David A. Struckman, and that some of the information passed along to the government may have come from Struckman himself.  Furthermore, it is also the recollection of SAs Chinn and Hardaway that Gary D. Moritz may have obtained some of the information passed along to the government by perusing documents that were easily viewable, for example, while visiting Jennifer and her family at her residence.
>
> 5.  SA Chinn was the contact for Gary D. Moritz from on or about September 13, 2000 through January 25, 2001, when a physical meeting

between Gary D. Moritz and SAs Chinn and Hardaway occurred, and again on March 15, 2001.  SA Hardaway attended the aforementioned January 25, 2001 meeting and was the contact for Gary D. Moritz on March 13, 2001 and from April 17, 2001 forward.  There were later occasions when an anonymous source would telephone and leave information with others, and it is believed that the caller was most likely Gary D. Moritz.

Exhibit A attached to Gov't Sealed *In Camera* Declaration Regarding Anonymous Informant No. 1, Dkt. 346

On April 23, 2007, defendant filed his Sealed Response to Court's Order Concerning AI-1.  Dkt. 356.  In addition to citing to a number of discrepancies concerning the government's handling of AI-1, defendant filed declarations by Gary D. Moritz (Ex. B), Bonnie Moritz (Ex. C), and Jennifer Wininger (Ex. D).  Each declarant declared, under penalty of perjury, that except where explicitly noted to the contrary, the declarant had personal knowledge of the facts set forth in his or her declaration and, if called upon to testify to said facts, could do so competently.[6]

Gary Moritz declared: "I do not recall giving any information to [SA] Hardaway concerning David Struckman, did not recognize [SA] Hardaway when he served me with a subpoena, and do not remember David Struckman."  *Id.* Ex. B

Bonnie Moritz' declaration states, in part:

2.  I was contacted by Special Agent Michael Hardaway on February 20, 2007.  He served my husband, Gary Moritz, with a subpoena at my house, and he gave my husband his contact points. . . .

---

[6] Although defense counsel was still under the protective order not to reveal the identity of AI-1 as Gary Moritz to anyone at this time, the government itself revealed the alleged informant's identity to Gary Moritz and Bonnie Moritz when SA Hardaway served the subpoena on Mr. Moritz on February 20, 2007.  According to Bonnie Moritz, SA Hardaway did not tell either Mr. Moritz or Mrs. Moritz that the information was confidential and should not be communicated to anyone else. Ex B, ¶ 2-3, Dkt. 356.

3.  I contacted Michael Hardaway and I asked him why Gary had been subpoenaed.  Special Agent Hardaway . . . told me that Gary was and had been an anonymous informant for years for the government against David Struckman, my ex-husband.  Special Agent Hardaway claimed he had only identified Gary as the informant "recently" but also told me he had personally met with Gary and spoken to him numerous times.  First, Agent Hardaway said "Didn't Gary tell you what he was doing?" Then, after I questioned Agent Hardaway, Agent Hardaway said Gary was scared I would find out.  Special Agent Hardaway left the impression that my husband Gary could get in trouble with a judge unless I submitted a doctor's note to excuse him from appearing at the hearing he was subpoenaed to.

4.  I did not find the allegation of Gary being an informant to be credible, since Gary hardly knew Dave, knew very little about Global, never associated with Dave, never worked with Global, rarely attended family functions. . . Gary did not even know Dave's home address, never visited Dave at his home, never talked with Dave during this time, never visited either of my daughters, Jennifer or Rachel at their homes, rarely had discussions with my daughters, and any information he knew about Dave would only be information I told him, which was very limited.  Gary did not solicit information from me about Dave or Global, and Gary did not even know how to use a computer or would even know the difference between a browse and an operating system.  Gary lives a low profile life, avoids being part of anything, and goes out of his way to avoid involvement whenever possible.  Gary rarely saw or talked to my children, never visited them at my house, their house, Dave's house, or anyone else's house, and is not socially involved with Dave or my daughters.  I do not believe Gary would do anything to place myself, or my daughters, in difficulty.

5.  On February 26, 2007, Special Agent Hardaway called me again and

28

wanted me to agree to let him come to my house to talk with Gary.  Agent Hardaway implied this was an order from a Judge, but Agent Hardaway produced no such order for me.  I informed Agent Hardaway that Gary does not remember ever being an informant or giving them any such information at any time.  When I told Agent Hardaway I wanted to protect Gary's legal rights, Agent Hardaway implied the judge might force him to talk to the judge.  I interpreted this as a threat against my husband if I did not agree to let Agent Hardaway speak to him in private.  I again refused Agent Hardaway's request.  Then Agent Hardaway said the judge might issue a bench warrant for Gary's arrest.  I interpreted this as another threat.  I terminated the phone call and contacted attorneys to give me and Gary legal counsel in this matter, as I did not trust Agent Hardaway.

6.  At 4:30 p.m., on February 26, 2007, Agent Hardaway called me again, asking me if he could fax me a questionnaire with questions for Gary to answer.  I agreed, and upon receipt of the questions, I knew right away that Gary could not have provided most of the information contained in the questions.  He simply did not have access to that information, as I did not even know it.  I presented the questions to Gary and he could not make any sense out of what they were asking for and denied knowing any of the information in the questions.  I informed Agent Hardaway of this fact.

7.  On March 1, 2007, Special Agent Hardaway called me . . . and wanted to know how my daughters would react to hearing Gary was alleged to be the informant. . . . He then asked me if I might fear for Gary's life, and I said "from my ex???!!NO! Not at all!"

8.  After Hardaway's phone call, I called my daughter, Jennifer, to let her know the government was accusing Gary of being the informant.  I was concerned that Agent Hardaway was trying to create family divisions based on untrue information because of his past interactions with me.  I had been

previously interviewed by Agent Hardaway in 2003 when Agent Hardaway threatened to subpoena me to a grand jury and demanded an interview with me. He saw Gary there in the house and this had no effect on his demeanor. Agent Hardaway continued to interrogate me and continued to brag about the personal, intimate information he knew about my family, including intimate information about my daughters' family life. I felt Agent Hardaway was trying to threaten my family if I did not give him negative information about Dave. Due to my concerns with what I believe are untrue allegations against Gary, I retained an attorney, David Tingey, to represent Gary.

9. Any information Gary could have had would have had to come from me, and any information I had usually came from my daughter Jennifer. Gary did not interact with David Struckman at all and rarely interacted with Jennifer. Jennifer never visited Gary at our house or her house and never brought documents of Dave's to our house. Gary never visited Jennifer's house or Dave's house.

 . . . .

28. Jennifer never told me, I never knew, and I never told Gary, David had an account with Chase Manhattan Bank or the numbers of such accounts. Gary would not be capable of 'going behind the net' to obtain passwords into Chase Manhattan's website as I had to set up Gary's computer for him to look at the internet. . . .

. . . .

33. Jennifer never told me, I never knew, and I never told Gary that David used his mother's maiden name as an alias. I do not even know David's mother's maiden name. We had been divorced for fifteen years prior to his involvement with Global in 1997.

*Id.* Ex. C.

Bonnie Moritz contradicts almost every single statement attributed to her husband

as AI-1 in the same manner as above, and in addition, states that she and Jennifer discussed over the phone much of the private, family related information attributed to Gary as AI-1 and that she believed her "phones were tapped in some manner during this time." *Id.* at ¶ 91.

Jennifer Wininger's declaration states, in part:

2. My mother, Bonnie Moritz, contacted me and informed me that the government had identified Gary Moritz as an informant in the case against David Struckman, my father.

3. I do not believe Gary could have provided much information to the government, if any, because Gary was not a participant in Global, did not interact much at all with me, and did not interact with David whatsoever.

Dkt. 356, Ex. D.

On April 26, 2007, the court found that the government's April 16, 2007 submission suffered from the same infirmities as its previous submission since nowhere in the government's submission did the agents state under penalty of perjury that the contents of their statements were true and correct.  April 26, 2007 Order, Dkt. 467 at 2. The court thereupon found that "without the proper attestation, the purported declaration is merely hearsay evidence which the court cannot consider for the truth of the statements therein."  *Id.* citing to *see e.g.*, *Finch v. Barnhart*, 463 F.Supp.2d 1002, 1003 n.2 (9th Cir. 2006); *see also Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995); *Hayes v. Garcia*, 461 F.Supp.2d 1198, 1201 (S.D.Cal. 2006).  The court further found that the government had thus "not made any showing that would allow the court to balance the government's interest in withholding the identity of Anonymous Informant No. 1 against the defendant's right to prepare his defense." *Id.* at 3.  The court therefore granted defendant's motion to disclose the identity of AI-1 and vacated the protective order placed on defense counsel not to disclose the identity of AI-1 as Gary D. Moritz.  *Id.*

**VI. Defendant's Motion to Compel Discovery**

1    On April 18, 2007, defendant filed a motion to compel disclosure, under

2  *Brady/Giglio*, of exculpatory material concerning four government witnesses, including

3  Dave Bowden.  Def.'s Mot. to Compel Immediate Disclosure of all Exculpatory

4  Material and Relevant Gov't Records, Dkt. 351. Specifically, the defendant sought as to

5  Bowden:

6         IRS records (such as tax returns, audit file, IRS and IMF information) of

7         Dave Bowden, necessary to each of the following - 1) Bowden's motivation

8         for illegal black bag operations at the behest of the government; 2)

9         Bowden's motivation to lie about Struckman in this case; and 3) Bowden's

10        past acts of perjury on tax forms and past acts of perjury in this very case

11        before the grand jury, perjury the government either did or should have

12        known was perjury.

13  *Id.* 2

14    On April 23, 2007 the government filed its response to defendant's motion.

15  Response to Defendant's Motion to Compel Immediate Disclosure of all Exculpatory

16  Material, Dkt. 355.  In its response, the government stated it did not request tax returns

17  concerning Bowden and that '[m]oreover, there is no evidence that Mr. Bowden has

18  been audited or been non-compliant in his tax practices."  *Id.* 3:23-4:1.  As to the

19  allegation of "black bag operations," the government denied the allegation and stated

20  that "Mr. Bowden did not provide photocopied scraps of papers from Struckman's

21  vehicle to any IRS agent in this case." *Id.* 3:4-8.  However, the government did state that

22  Bowden had provided to SA Hardaway "materials relating to his Global Prosperity

23  involvement (trust documents and Anderson, Ark, & Associates [("AAA")] manuals) .[7]

24  *Id.* 3, n.2.  Apparently, SA Hardaway kept the items received from Bowden "separate

---

[7] Anderson, Ark & Associates, a sister case to Global Prosperity, "promoted offshore tax schemes that specialize in the layering of entities including foreign trust."  Anderson's Ark Briefing 5-2003, Def.'s Ex. 51, DBKL076.

from this case investigation file" and had only recently disclosed their existence to the prosecutors. April 25, 2007 Letter from Larry J. Wszalek to Robert Bernhoft, Def.'s Ex. 50.  Among the documents provided by Bowden to Hardaway were (1) an AAA letter, Def.'s Ex. 50(b), DB00002; (2) a document titled "Agency Agreement" signed by a Colmada B. Williams, dated September 27, 1999, with Dave Bowden's name and address under the section "Agent's Information," *Id.*, DB00072; (3) a second "Agency Agreement" signed by the same Colmada B. Williams, identifying a Dave K. Bowden as an agent but dated January 20, 2001, *Id.*, DB00123; (4) trust documents concerning a trust named "Consanguis Education Group identifying a Dave K. Bowden as the treasurer/accountant and Terri L. Bowden as the secretary, *Id.*, DB00011; (5) US Bank Statements for the Consanguis Education Group for different dates spanning from June 21, 1998 to October 1, 2001, *Id.*, DB00101-00113.  The statement dated January 31, 2001 shows 3 transactions, a deposit of $2,500.00 and two withdrawals, through a check for the amount of $1,000 and a second check for the amount of $900.  *Id.* DB00110; and (6) a number of video and cassette tapes, including the Global Prosperity 2001 Course, 12 Cassette Tape.[8]  Def.'s Ex. 50(A), page 2.

On May 2, 2007, the court granted defendant's motion to compel, reminding the government that under this circuit's precedent, "exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does."  May 2, 2007 Order, *citing United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004).

On May 3, 2007, the government filed a motion to correct Docket 355.  Dkt. 382. In its motion, the government acknowledged it had made a "misstatement" concerning

---

[8]  The Global Prosperity tapes series, otherwise referred to as the G-1 product, are the "products" the government alleges were sold by co-defendants and from which sale the government alleges the defendants derived income that should have been reported.  Govt's Opp'n to Defendant's Motions In Limine, Dkt. 298 at 7.  The government alleges Global Prosperity sold the G-1 tape series from 1997 through 2001.

1  the existence of an audit on Bowden, since "[t]he fact of the audit was contained in the

2  government's discovery disclosure to defense counsel on March 28, 2007.  An IDRS

3  printout confirmed the existence of an audit."[9]  *Id.* at 1.

4      On the same day, government counsel informed defense counsel that the

5  government now realized it had been in possession of additional impeachment evidence

6  relating to Bowden.  The government informed defense counsel that:

7      Special Agent Hardaway reports that he was contacted by David Bowden

8      sometime in 2004 and was informed by Mr. Bowden that he was being

9      audited by the IRS.  Special Agent Hardaway did not generate a

10     Memorandum of this contact.

11     Special Agent Hardaway reports that he had subsequent contact with the IRS

12     Revenue Agent on one occasion concerning Mr. Bowden's audit.  Special

13     Agent Hardaway did not generate a Memorandum of this contact.

14     Special Agent Hardaway reports that he orally disclosed this information to

15     the undersigned on several occasions after the one-time contact with the IRS

16     Revenue Agent.  This should have immediately triggered a *Giglio*

17     disclosure.

18  Def.'s Ex. 88.

---

[9]  The IRS web site states:

The Integrated Data Retrieval System (IDRS) is a mission critical steady state system

that consists of databases and operating programs that support [IRS] employees working

active tax cases within each business function across the entire [IRS]. This system

manages data that has been retrieved from the Tax Master Files allowing [IRS]

employees to take specific actions on taxpayer account issues, track status, and post

transaction updates back to the Master Files.  It provides for systemic review of case

status and notice issuance based on case criteria, thereby alleviating staffing needs and

providing consistency in case control.

Internal Revenue Service, United States Department of the Treasury, IDRS System Overview,

*available at* http://www.irs.gov/privacy/article/0,,id=138125,00.html

In a MOI written on May 4, 2007 by SA Hardaway, Hardaway stated: SA Hardaway received a telephone call from Dave Bowden (Bowden) in which he stated he was being audited by the IRS.  SA Hardaway cautioned Bowden regarding his witness status, and that it would not be proper for SA Hardaway to get involved or do Bowden any favors.  SA Hardaway's recollection is that Bowden told SA Hardaway he told the revenue agent who was conducting the audit that he had provided information to IRS special agents for a case, and had testified for the government at a trial. Furthermore, it is SA Hardaway's recollection that Bowden stated he gave SA Hardaway's name and phone number to the revenue agent, told the revenue agent SA Hardaway had his records, and asked the revenue agent to contact SA Hardaway.  Bowden may have given SA Hardaway the revenue agent's name and telephone number.  SA Hardaway did not memorialize the contact at that time.

SA Hardaway's recollection is that the revenue agent subsequently telephoned SA Hardaway and left a message, and that SA Hardaway returned his telephone call, but it is possible SA Hardaway telephoned the revenue agent.  SA Hardaway recalls the revenue agent may have worked out of a post-of-duty in the Tri-Cities, Washington area, and that his working Bowden may have been part of some project.

The revenue agent wanted to know if SA Hardaway could help out with any information, and SA Hardaway told the revenue agent the investigation Bowden was involved with was grand jury, and that grand jury evidence cannot be shared with the civil functions.  It is SA Hardaway's recollection that he admonished the revenue agent to do his normal "due diligence" and that if he saw something that looked interesting he should "do his job." Further, it is SA Hardaway's recollection he told the revenue agent to not base any decision or action on the fact Bowden assisted the government

1    with a criminal investigation and trial.

2        It is SA Hardaway's recollection the revenue agent made some sort of

3        comment that Bowden's case didn't appear to be very interesting and there

4        "wasn't anything there."  It is SA Hardaway's recollection he commented

5        something like "that is my impression as well."  SA Hardaway did not

6        memorialize the contact at that time.

7        It is SA Hardaway's recollection these two contacts, which cumulatively

8        took approximately 5 minutes or so, occurred sometime in calendar year

9        2004.

10   Def.'s Ex. 53.

11        On May 4, 2007, at the request of government counsel, the court held a telephonic

12   status conference.  May 10, 2007 Order Setting Status Conference, Dkt. 388.  At that

13   time, government counsel informed the court the government would be unable to

14   produce the discovery requested by defendant before the trial set for May 7, 2007.  *Id.* at

15   2.  The court then reiterated it had granted an evidentiary hearing concerning

16   defendant's motion to take place before the commencement of trial.  *Id.* Because the

17   court was under the impression defense counsel wanted to incorporate the *Brady/Giglio*

18   material in defendant's motion to dismiss for outrageous government misconduct, the

19   court vacated the trial set for May 7, continuing the hearing on defendant's motion to

20   dismiss to July 9, 2007.  May 8, 2007 Order, Dkt. 385.

21        On May 10, 2007, defendant filed his Motion to Dismiss for Unnecessary Delay

22   in the Trial Procured by Governmental Misconduct.  Dkt. 387

23        On May 11, 2007, in an attempt to take affirmative steps to protect defendant's

24   rights under the Speedy Trial Act, the court held an additional status conference to

25   ensure that defendant had agreed to the continuance of trial to July 9, 2007.  At that

26   time, the court queried defendant, who agreed to the July 9 continuance.  May 11, 2007

27   Minute Entry, Dkt. 390.

28        On June 22, 2007, Special Agent Summer Rose ("SA Rose") and Special Agent

Ben George ("SA George"), both with the Criminal Investigation of the IRS, conducted a telephone interview of Dave Bowden.  Def.'s Ex. 85.  According to the MOI of the interview, the agents telephoned Bowden with the purpose of taking statements to draft a declaration.  *Id.*  The agents read "verbatim" parts of Bowden's testimony to the Grand Jury.  *Id.*  According to the MOI, Bowden stated he believed he received the $30,000.00 check from Struckman, and that he may have received the check while out to dinner with Struckman or at Struckman's home.  *Id.*  Bowden stated the last time he detailed cars for Struckman was at the end of 1996 or 1997, around the time that Struckman moved to Issaquah, Washington.  *Id.*  Bowden stated he met SA Hardaway before his grand jury appearance about three times: once at Bowden's home, once at the IRS office, and one other time prior to his grand jury testimony.  According to Bowden, "Bowden and Hardaway talked on the phone two or three times as well."  *Id.*  ¶ 8.

The MOI goes on to state Bowden said:

9.  Bowden first took documents to copy from Struckman's car in late 1996 or early 1997. . . . Bowden took and copied documents from Struckman's car two or three times in total.  Bowden did not take and copy any documents from Struckman's car after Bowden stopped doing detail work for Struckman in late 1996 or early 1997.

. . . .

11.  Bowden remembers taking and copying from Struckman's car what he believes were telemarketer script and documents with the "Crescent Moon" logo on them.  Bowden would take and copy any documents that appeared to concern the Global Prosperity group which were in the car when he took it for detailing.  Bowden took these documents because he knew that Struckman was promoting a scam and because he believed that someone would be contacting him in the future about this scam.

12.  Bowden came up with the idea to take and copy documents from Struckman's car on his own.  Bowden and several friends had lost money

37

because of Struckman's deal and Bowden wanted documents to prove what was going on with Struckman.

13.  When Bowden testified before the grand jury that he provided copies of documents taken from Struckman's car to "the detective," Bowden meant that he provided copies of these documents to Hardaway.

14.  . . . Bowden told Hardaway that he had these documents and how they came into his possession.  Bowden also gave Hardaway documents that Struckman had given to him that related to the Global Prosperity group.  Bowden is not certain which specific documents he gave to Hardaway.

 . . . .

16.  When Bowden found other documents in his possession related to Struckman or the Global Prosperity group, he would call Hardaway.  Hardaway would tell Bowden to hold onto the documents until he came into the office.

17.  Bowden gave these documents to Hardaway because Bowden's friends had been ripped off by Struckman and he wanted to help prevent Struckman from ripping off others.

20.  Hardaway did not ask Bowden to take documents from Struckman's car, make copies of them, and turn these copies over to the government.  These documents had been taken years before Bowden met Hardaway.  Hardaway did not ask Bowden about these documents.

Def.'s Ex. 85.

> The following day, On June 23, 2007, when SA George went to Bowden's residence to . . . have Bowden sign the declaration, "Bowden showed S/A George several pictures and a document which were in his possession which Bowden said belonged to David Struckman.  Bowden offered the pictures and document to S/A George. . . . Bowden asked if he was going to get in trouble for having taken documents from Struckman's car.

1  Def.'s Ex. 86.

2  **VII.  Evidentiary Hearing**

3       On July 9, 2007, the court held an evidentiary hearing on defendant's motions.

4       **A. AI-1**

5       At the hearing, SA Robert Maning testified that SA Chinn told him that SA Chinn

6  was going to meet with an anonymous informant, and had asked SA Maning to attempt

7  to observe the informant in an attempt to determine how the informant left the premises

8  after speaking to SA Chinn.  2 TP 253-54.[10]  SA Maning testified that from some

9  distance, he had followed the informant through the mall after the meeting and had seen

10  the informant get into a vehicle.  *Id.* 255: 16-25.  SA Maning remembers making a note

11  "of either the license plate number or the other identifying number of the vehicle."  *Id.*

12  SA Maning assumed SA Chinn had asked him to write down the license plate number to

13  identify the informant.  *Id.* 258:17-21.  Although SA Maning did not have a specific

14  recollection, he believes he gave SA Chinn the vehicle number.  *Id.* 260:17-23.  SA

15  Maning testified he himself had not run the vehicle number through the Department of

16  Motor Vehicles' database.  *Id.* 261: 8-11.  The best description that Maning could

17  provide of the informant from his vantage view at 150 feet away, was that the informant

18  was a middle age white male.  *Id.*  262:3-10.

19       SA Chinn testified that he had received a call from an anonymous person who had

20  "gotten wind" that Struckman was under investigation and that he had some information

21  for SA Chinn.  2 TP 264:11-15. Although he does not remember doing so, SA Chinn

22  testified that procedurally, he would have "taken the [vehicle number] back to the office,

23  ran the plate through our DMV machine.  Probably at that point came back with the

24  registered owner of that vehicle."  *Id.* 268: 2-8.  He testified that he believes the number

25  "came back to Gary Moritz."  *Id.*  268:10.  Although he does not remember if he kept

26

27       [10]  "TP" refers to Transcript of Proceedings, followed by page number and line number,

28  when necessary.

1  the DMV record in the case file for this investigation, SA Chinn testified that he made

2  available to the prosecuting attorneys everything he had.  *Id.* 268:22

3      When confronted with a copy of an e-mail he had sent to SA Hardaway dated

4  May 14, 2004, SA Chinn testified that although he had submitted a declaration declaring

5  that his involvement with the Struckman investigation had ended in early 2001, he had

6  only meant his "formal" involvement.  *Id.* 270:17-272:17.  The e-mail stated:

7          Ted said Strucky might be at Bovee's ranch in Idaho, doesn't know where it

8          is but 10 aces (sic) and 3000 square feet[,] the phone # to the ranch is

9          [phone number given] and Rachel Bovee's e-mail address is [address] about

10         a month ago strucky (sic) gave his 1997 expedition to Jennifer her address

11         is [address] Ted said that Struck might hide out at the cabin in Idaho.

12  Def.'s Ex. 93.

13     SA Chinn testified that when he first met the informant, Ted had not given him a

14  way to contact him, and that at no time had SA Chinn attempted to contact Ted.  2 TP

15  274: 8-13.  SA Chinn testified that although he knew the anonymous informant called

16  Ted was Gary Moritz, SA Chinn had failed to register Ted as a confidential informant

17  because Ted wanted to remain anonymous.  *Id.* 279-280.  SA Chinn also testified that he

18  did not recall Ted telling SA Chinn that Ted "had gone behind the net, hacked in a

19  computer and got PIN codes, bank numbers, and all kinds of private information."  *Id.*

20  281:8-11.

21     SA Holm testified that although he had declared that he had "had no contact with

22  AI-1/Ted, either telephonically, in person, or otherwise from October 1997 to the

23  present," Def.'s Ex. 203, when confronted with an e-mail sent by him to SA Hardaway

24  attributing information received via phone from "[t]he anonymous guy you've been

25  dealing with (who really isn't that anonymous)," SA Holm testified that he was referring

26  to someone he thought was Ted, and thus, that he had had contact with Ted "not

27

28

knowingly." 2 TP 287:5-289:22.[11]

When shown another e-mail from him to SA Hardaway dated May 23, 2005 and titled "Your Informant on Struckman," SA Holm testified that he had "no recollection of this call at all."[12] *Id.* 290:13-16.

When shown another e-mail sent by him to a number of recipients, including a government attorney with the tax division and RSO O'Brien concerning information received from an informant, SA Holm testified that he did not recall who was that informant. *Id.* 291:221. SA Holm testified he did not "know what [he] had said about AI-1 in the search warrant affidavit for sure." *Id.* 296:10.

SA Hardaway testified that although SA Chinn had told him SA Chinn had identified Ted as Gary Moritz through a vehicle identification number, SA Hardaway

---

[11] SA Holm's e-mail to SA Hardaway, titled "Anonymous Call re: Struckman," and dated May 9, 2005, states:

> The anonymous guy you've been dealing with (who really isn't that anonymous) called me this morning and gave me the following info:
>
> 1. Struckman's daughter and brother-in-law have been visiting him recently in Panama. His brother-in-law is Michael Bovee.
>
> 2. They saw Struckman twice recently (I got the impression within the last year and the last trip was fairly recent-within the last month or two).
>
> 3. Struckman was bit (sic) by a scorpion and had to get medical treatment.
>
> 4. Bovee's home phone number is [phone number]
>
> 5. Bovee's home address is: [address given].

Def.'s Ex. 96

[12] The e-mail stated:

> Hey Mike -
>
> he called me about 10 minutes ago. he says that it's long distance for him to call you in everett - so I think that is why he is calling me. anyway, he said Mike Bovee is putting his house for sale and that he though he'd just let us know that.

Def.'s Ex. 97

continued to refer to the informant as AI-1.  2 TP 300-302.  SA Hardaway testified that
in his procedure, he refers to someone who provides him information but wishes to
remain anonymous as "anonymous informant" even after he knows the informant's
identity.  "If it's their wish to be anonymous, they're anonymous." *Id.* 338: 16-25.  SA
Hardaway also testified that Ted never called him at his Everett office because Ted
"indicated he never wanted to make a long distance call.  He was worried that a call
would show up on a bill and he would be found out."  *Id.* 341: 3-19.

Called by the government, Gary Moritz testified.  2 TP 352.  When asked what he
did before he retired, Mr. Moritz said "I think I worked for a utility company." *Id.*
353:10.  When questioned why he had to stop and think about his statements, Mr.
Moritz testified:

> I decided I was going to clean the gutters out, so I went and got my big
> ladder.  I got right up to the roof.  That's the last I remember.  I hit the deck
> and I don't remember hitting the deck, but if my wife wouldn't have been
> out there I would be under the dirt.
>
> . . . .
>
> I ended up a brain bleed they call it.
>
> I can't remember things.  I hit my face on the deck.
>
> I have a hard time even recalling – maybe even half hour ago.  I just forget.

*Id*. 353: 18-22.

Mr. Moritz also testified that he did not remember his birthday, but could find out
if he looked at his license, that he did not know if he could find his way back to his
house from the courthouse, and with obvious distress on his face at his lack of memory,
when asked if he had children, he said "Wife said they came to the Harborview Hospital
. . . I think I have an older daughter."  *Id.* 354:12-355:7.  When asked what his
daughter's name was, Mr. Moritz responded "I should know that.  I should really know
that."  *Id.* 355:9.

When questioned about SA Hardaway by the government, Mr Moritz responded:

42

| | | |
|---|---|---|
| 1 | Counsel: | Have you spoken to an IRS Special Agent since you had your |
| 2 | | accident?  Did they come to your house? Did they talk to you |
| 3 | | and serve you with a subpoena to show up in court today? |
| 4 | Mr. Moritz: | Yeah.  That's it.  I got one of those. |
| 5 | Counsel: | You remember that occurring?  You remember you got a |
| 6 | | subpoena to show up for court today? |
| 7 | Mr. Moritz: | Actually, yeah.  I think I do remember that. |
| 8 | Counsel: | Who was the person who served that subpoena on you? |
| 9 | Mr. Moritz: | Hardwick (sic), I think |
| 10 | Counsel: | Special Agent Hardaway? |
| 11 | Mr. Moritz: | Yeah. |
| 12 | Counsel: | You met him before; is that correct? |
| 13 | Mr. Moritz: | Well, I think he came to the house a couple of times, but I can't |
| 14 | | tell you when |

*Id.* 356.

| | | |
|---|---|---|
| 16 | Counsel: | Since [your fall from the roof] an IRS agent has come to visit |
| 17 | | you at least a couple of times to serve you with subpoenas? |
| 18 | Mr. Moritz: | I got a subpoena from him or somebody like him. |
| 19 | Counsel: | What did this person look like? |
| 20 | Mr. Moritz: | I have no recollection of what he looks like. |
| 21 | . . . . | |
| 22 | Counsel: | So why would you recognize an IRS Special Agent and not your |
| 23 | | own daughter? |
| 24 | Mr. Moritz: | I don't know if I recognize him. |
| 25 | Counsel: | Why do you recall – why do you suppose it is that you recall and |
| 26 | | IRS Special Agent giving you a subpoena – |
| 27 | Mr. Moritz: | Pardon me? |
| 28 | Counsel: | – but you don't recall your daughter coming to visit? |

1   Mr. Moritz: I didn't look at it.  I – it was cold and I put it in my pocket.  And

2              I went into the house and told the wife I got a ticket.

3   *Id.* 357-58.

4   Counsel:    Isn't that true, you've been giving the IRS information on

5              David Struckman for the last several years?

6   Mr. Moritz: I can't tell you that.  I don't know.

7   Counsel:    You don't know if it's yes or no?

8

9   Mr. Moritz: Yeah, I don't.

10  *Id.* 358: 19-23.

11      **B. Bowden's Tax Audit**

12          **1. Revenue Agent's Testimony**

13      Defendant introduced a certified copy of documents from the administrative file

14  pertaining to the examination of Terri and Dave Bowden (the "Bowdens") for the tax

15  period ending December 31, 2001 (the "audit file").  Def.'s Ex. 51.  The audit file

16  contains a letter addressed to the Bowdens and dated June 18, 2003 and signed by

17  Compliance Group Manager Rick O'Brien, informing the Bowdens they have been

18  selected for "examination" by the IRS, because the IRS has identified them "as . . .

19  holder[s] of an offshore payment cards(s) or a participant in offshore financial

20  arrangements."  Def.'s Ex. 51, DBKL052-054.   The letter extends the Bowdens a "final

21  opportunity to minimize [their] exposure to penalties by providing [the IRS] with

22  complete information to the [IRS] to determine the proper tax treatment of any

23  unreported offshore activity." *Id.*  In exchange for the offer, the Bowdens were to

24  provide, among other documents, tax related documents for all tax years ending after

25  December 31, 1998; description of offshore payment cards and foreign and domestic

26  accounts of any kind; and "[d]escriptions of entities of any kinds (including but not

27  limited to corporations, . . . trusts and estates) and any nominees through which you

28  exercised control over foreign funds, assets, or investments at any time after December

44

31, 1998." *Id.* DBKL053.  The letter stated the Bowdens had only 30 days from the date of this letter to contact the IRS.  *Id.* DBKL054.

The Examining Officer's Activity Record, in the contacts and Activities sections, contains the following notations.

| | | |
|---|---|---|
| 06/23/03 | | Re'cd call from TPH [taxpayer husband]- discussed involvement and referred me to SA Michael Hardaway @ [phone number].  TPH stated he did no use abusive off-shore scheme to evade taxes.  Lost money.  Is currently involved in testifying for Govt in case against promoters.  Requested letter* |
| | | *called SA Hardaway - confirmed story |
| . . . . | | |
| 06/27/03 | | Updated History Sections |
| | | *called TPH - left generic message to remind and clarify on the letter requested to provide complete background of involvement in schemes (AA/Global). |

Def.'s Ex. 51, DBKL030

The file contains a letter addressed to Rick O'Brien and signed by Dave Bowden, postmarked July 2, 2003 and  stamped as received by IRS July 07, 2003.  In the letter, Bowden states, in part:

I did not understand anything about this scam when Dave Struckman took me to U.S. Bank to set up a foreign trust, or G.P.G. until after we [went] to Mexico on one of their seminars.  I got into a couple of these investment which I felt like it was legal, but later found out they were scamming people . . . We have went (sic) before the Grand Jury against Lori Struckman and told them everything we knew about what went on.  She is waiting sentence now.  I have been working with Michael D. Hardaway Special Agent I.R.S. and Grand Jury to help put the rest in jail.  He has all trust papers and

everything I had on G.P.G.  We lost a lot of our saving due to this and never

reeived a dime in return. . . . We just got scammed the same as 10s of 1000s

of people.

Def.'s Ex. 51, DBKL066.

Revenue Agent Joseph Michael Battaglino ("RA Battaglino") testified at the

evidentiary hearing that he was assigned to conduct a civil audit of Bowden around

August 2004.  1 TP 68:5-14.  Although there were notes on the intake sheet indicating

prior contact with Bowden, RA Battaglino testified that such notes were not his, and that

it appeared that the case had been assigned to someone else before being assigned to

him.  *Id.* 68:16-23.

According to RA Battaglino, although he does not remember receiving the

Anderson's Ark Briefing 5-2003 in Terri and Dave Bowden's audit intake file, the

briefing instructed him to focus on 2000 and 2001 in his initial audit review.  *Id.* 25-26.

RA Battaglino testified that although the regular statute of limitations to audit a timely

filed tax return is three years, under reporting of income in excess of 25 percent of gross

income for a particular year could create a six-year statute of limitations.  *Id.* 82:1-8.

The audit file also contains a letter dated August 17, 2004 addressed to the

Bowdens whereby RA Battaglino informed the Bowdens that their federal tax returns

for the year 2001 had been selected for examination.  Def.'s Ex. 51, DBKL050; 1 TP

30-31.

RA Battaglino testified that according to his notes, when he called the tax payers,

the taxpayer "was very surprised and not real happy that we did not contact him in

almost a year," and that RA Battaglino had explained to Bowden he had just gotten the

case and needed "few items to finish on the case."  1 TP 59:11-18.  The notes also state

that "all his records were in the possession of SA Hardaway."  *Id.*

RA Battaglino testified that according to his notes, on September 15 and 22, 2004

he called and left messages for SA Hardaway.  On October 7, 2004, he finally talked to

SA Hardaway, who confirmed that he had the taxpayers records and that RA Battaglino

1         [W]as more than welcome to come take a look at them.  He said

2         there's not much there.  He confirmed the taxpayer has cooperated on the

3         case, testified against promoters in the grand jury case and might testify in

4         the future.  I told him I would talk to my Manager and get back to him next

5         week.  There is nothing on the return that appears to need examination.

6 1 TP 61:5-11; Def.'s Ex. 51, DBKL034.

7       RA Battaglino testified that according to his notes, the manager told him to "go to

8 Seattle and review the records of Hardaway, [and] make a determination whether to

9 further proceed in case." 1 TP 61:24-62:1.  RA Battaglino then called SA Hardaway and

10 left a message.  *Id.*

11       RA Battaglino testified that according to his notes, on October 18, 2004, he set up

12 an appointment with SA Hardaway "in federal building room 310."  *Id.* 62:17-20. RA

13 Battaglino testified that according to his notes, after realizing he had misunderstood

14 where SA Hardaway was, he called SA Hardaway and rescheduled. *Id.* 63:7-14.

15       RA Battaglino testified that according to his notes, he met SA Hardaway on

16 November 9, 2004. Id. 63:18.  According to his notes, Battaglino:

17 RA Battaglino:     Traveled to Everret via Kingston ferry.  Met with SA

18                     Hardaway at 3020 Ruckers Avenue Everett.  Secured all

19                     the records on AAA investments --

20 Def.'s Counsel:     Could you read that again starting with He had –

21 RA Battaglino:     He had secured all taxpayer records for AAA

22                     Investments.  Taxpayer had invested in the trust in '97.

23                     Invested $25,000, all of which was lost.  Taxpayer

24                     testified against promoter in two grand jury and one trial.

25                     Per SA, the taxpayer had been very cooperative.  Viewed

26                     taxpayer's records provided.  Taxpayer closed out trust in

27                     '99. . . Getting ready to retire on disability past 25 years.

28                     All records indicate taxpayer did possess disposed of

> trust.  Appears taxpayer had sufficient income to support
> himself and his wife.  Funds reported on the return.
> Assembled the case, print out work papers.  Appears to
> be a no-change exam.[13]

1 TP 63:17-64:13.

RA Battaglino testified that it appeared that within a week or two after his meeting with SA Hardaway, RA Battaglino had closed the audit.  *Id.* 65:12-18.  RA Battaglino testified that he did not recall seeing any documents that demonstrated that the taxpayer was still operating one of the Anderson Ark trust as of 2001.  *Id.* 66:8-12.

When shown defendant's exhibit 50(b),[14] RA Battaglino testified that he could not testify whether those were the documents SA Hardaway had shown him to review.  *Id.* 54:23-55:20.  He also testified that he could not remember the quantity of documents that SA Hardaway had given him to review.  *Id.*

When defense counsel asked RA Battaglino about the rate of no-change letters, RA Battaglino responded:

> Def.'s Counsel:    Isn't it a rare event in a so-called tax protester abusive
>                    trust scheme case to have a no-change?  Isn't that a rare

---

[13]  Curiously, RA Battaglino makes no mention of ever seeing the Agency Agreement identifying a Dave K. Bowden as an agent dated January 20, 2001; trust documents concerning a trust named "Consanguis Education Group" identifying a Dave K. Bowden as the treasurer/accountant and Terri L. Bowden as the secretary; and US Bank Statements for the Consanguis Education Group for different dates spanning from June 21, 1998 to October 1, 2001; all of which were found among the documents SA Hardaway identified as having received from Bowden and which SA Hardaway had "mistakenly maintained . . . under a different case file." Dkt. 355, n.2.

[14]  Exhibit 50(b) contains the items the government describes as having been received from Dave Bowden in May 2003, and which the government produced for defendant's counsel on April 25, 2007.

1    event?

2    RA Battaglino:      They happen.

3    Def.'s Counsel:     That's not what I asked.

4                        Isn't it a rare event, in your experience?

5    Gov't Counsel:      Objection.

6    The Court:          Objections sustained.  How many of such audits have

7                        you handled?  Talking about the tax protester.

8    RA Battaglino:      We can't call them.  Hundreds

9    The Court:          How many no changes do you think you had,

10                       approximation?

11   RA Battaglino:      Probably couple percent of that.  Probably four or five.

12   The Court:          Thank you.

13   1 TP 82:21-83:12.

14        After RA Battaglino testified that SA Hardaway had not given him any direction

15   concerning the audit, had not asked to find a no-change, or appraised him of what was

16   going on with the case, 1 TP 77 defense counsel then asked RA Battaglino:

17   Def.'s Counsel:     [Y]ou testified . . . that you didn't even recognize Special

18                       Agent Hardaway out in the hallway; is that correct?

19   RA Battaglino:      Correct.

20   Def.'s Counsel:     But you never met him before that time November 9,

21                       2004, in Everett?

22   RA Battaglino:      Correct.

23   Def.'s Counsel:     yet, [when government counsel] asked you two or three

24                       specific questions about what Special Agent Hardaway

25                       told you or didn't tell you, you gave crisp yes-or-no

26                       answers.

27                       Do you recall that?

28   RA Battaglino:      I read the history sheet.

| | | |
|---|---|---|
| 1 | Def.'s Counsel: | That was based on the history sheet? |
| 2 | RA Battaglino: | My recollection of reading the history sheet. |
| 3 | Def.'s Counsel: | Based on your interpretation of the history sheet? |
| 4 | RA Battaglino: | Yes. |
| 5 | Def.'s Counsel: | When you were answering [government's counsel]'s |
| 6 | | questions on cross-examination, you weren't testifying |
| 7 | | based on your recollection that Special Agent Hardaway |
| 8 | | said or didn't say anything? |
| 9 | RA Battaglino: | I would – I wouldn't have – it's not something I would |
| 10 | | have ever done, to no-change a case because an SA is |
| 11 | | telling you to. |

12  1 TP 83:14-84:11.

### 2. Dave Bowden's Testimony

At the evidentiary hearing, Dave Bowden testified that at one point, he had gone to the IRS building in downtown Seattle:

| | | |
|---|---|---|
| 16 | Def.'s Counsel: | Mr. Bowden, have you ever been to the Jackson Federal |
| 17 | | Building, 915 2nd Avenue in downtown Seattle? |
| 18 | Bowden: | I'm not sure. |
| 19 | | Is that where the IRS is? |
| 20 | Def.'s Counsel: | It is. |
| 21 | Bowden: | I was there. |
| 22 | Def.'s Counsel: | What was the occasion of your being there? |
| 23 | Bowden: | I was there after the indictment trial - - you know, |
| 24 | | sometime after that. |
| 25 | Def.'s Counsel: | What was the purpose of your visit . . . |
| 26 | Bowden: | Just to go over some of the paperwork I gave them so |
| 27 | | they understood. |
| 28 | Def.'s Counsel: | Who did you go over that paperwork with? |

1 | Bowden: | I don't know.  There was several of them there.

2 | Def.'s Counsel: | Special Agent Hardaway?

3 | Bowden: | Yeah, he might have been there.

4 | 1 TP 92:7-23.

5 | Bowden was then questioned about his involvement with Global Prosperity.

6 | Def.'s Counsel: | Did Special Agent Hardaway ever promise that you

7 | | wouldn't be criminally prosecuted for your involvement

8 | | with Anderson's Ark and Global?

9 | Bowden: | No.

10 | Def.'s Counsel: | Were you concerned about the possible criminal

11 | | prosecution?

12 | Bowden: | No.

13 | Def.'s Counsel: | Did you have Global meetings at your house at some

14 | | point in time, Mr. Bowden?

15 | Bowden: | Yes.

16 | Def.'s Counsel: | How many times?

17 | Bowden: | Twice.

18 | . . . .

19 | Def.'s Counsel: | Did you ever sell Global products?

20 | Bowden: | Yes.

21 | Def.'s Counsel: | What did you sell?

22 | Bowden: | The tapes

23 | Def.'s Counsel: | How many of those tapes did you sell?

24 | Bowden: | Two or three and gave away a lot of them.

25 | Def.'s Counsel: | How much money did  you make selling those tapes?

26 |

27 | Bowden: | When it was all over, none.  I gave back the money to the

28 | | people I sold them to.

51

1     . . . .

2     Def.'s Counsel:    Did you ever sell tickets to Global seminars?

3     Bowden:    No.

4 1 TP 100:8-101:13.

5     Defense Counsel then turned to the audit issue.

6     Def.'s Counsel:    Have you eve been audited by the IRS?

7     Bowden:    No.

8     Def.'s Counsel:    I'm sorry?

9     Bowden:    No.   No.   Never.

10     Def.'s Counsel:    I would like you to reflect carefully.  With counsel's

11                  permission I'll ask that question again.

12                  The IRS never audited you or your wife's tax returns?

13     Bowden:    Never.

14 1 TP 101:14-21

15     After testifying that he had never seen the letter addressed to the Bowdens and

16 signed by a Rick O'Brien and then shown the letter addressed to Rick O'Brien and

17 signed by a Dave Bodwen, Bowden testified that although he did not recognize the

18 letter, the letter looks like it is in his handwriting.  1 TP 102-104.

19     Def.'s Counsel:    Does this refresh your recollection as to writing that letter

20                  to Group Manager O'Brien?

21     Bowden:    Yes, but I don't know what his name is.  I mean, I wasn't

22                  - - I wouldn't remember it now, but I wrote the letter.

23     Def.'s Counsel:    Why did you write this letter?

24     Bowden:    Because they were - - sent me that first letter, now that I

25                  remember.  And they were going to audit me I told them

26                  what happened and they said - - they sent back a letter

27                  and said they weren't going to audit me at this time and it

28                  was all dropped.

1 TP 107:4-13

Bowden testified that he remembered getting the August 17, 2004 letter and that he remembered talking to RA Battaglino, the second one . . . [s]econd time they contacted" him. *Id.* 108-109. Bowden testified that after receiving the letter, he called them and told them he did not have the records and that he had given them to SA Hardaway. *Id.* 109. Bowden testified that while he does not know what he gave SA Hardaway, he did not give SA Hardaway his tax records but "the trust stuff that was set up at the trust." 1 TP 110: 1-7.

Bowden also testified that he stopped using the AAA trust in "'98, I'm sure. I mean, I kept it there, but I didn't use it." 1 TP 111:22-25. He continued paying the yearly fee because he hoped "maybe somebody would send me back some of the money I got screwed out of." *Id.* 112: 1-8.

When shown the US Bank Statement for the Consanguis Education Group dated January 31, 2001, Def.'s Ex. 50(b), DB-00110, Bowden testified:

| | |
|---|---|
| Def.'s Counsel: | Do you recognize that, Mr. Bowden? |
| Bowden: | It looks like the bank statement for the trust. |
| Def.'s Counsel: | Trust that you purchased from Anderson's Ark? |
| Bowden: | Right. |
| . . . . | |
| Def.'s Counsel: | So you had a bank account with the trust as late as 2001? |
| Bowden: | Must have. |

1 TP 112:18-113:1

When questioned about specific dates, and after Bowden was seen referring to some notes he had written down after looking as his wife's journal, Bowden testified that he no longer keeps track of days or weeks because he is "retired on a disability and [has] had seven surgeries and takes a lot of pain pills." 1 TP 115-118.

After being asked specific questions concerning the interview by SA Rose and George before the hearing, Bowden stated that the dates in his declaration dated June

23, 2007, "are all wrong," *Id.* 120:18, Bowden testified:

| Def.'s Counsel: | These dates here are all wrong? |
|---|---|
| Bowden: | Yeah.  I was just guessing, the best of my knowledge.  I don't think there was too much if it was in '96, might have been something in '96.  Most was mostly in '97 and '98. |

*Id.* 120:20-22

When Bowden testified that he would make less than $1,000 from Struckman when he was detailing Struckman's car, 1 TP 183, Bowden was then questioned about his previous testimony before the Grand Jury in the case against Laura Struckman.

| Def.'s Counsel: | On this page a grand juror says, asking you a question, How much money a month do you figure he was spending on just getting those cars detailed? And can you read your answer starting the very next line? |
|---|---|
| Bowden: | It varied quite often.  It went anywhere from 1,000 to 2500 to 3,000. |
| . . . . | |
| Def.'s Counsel: | Could you read that answer for me, please? |
| Bowden: | "I figured I didn't lose too much because he was spending so much at the detail shop so I could invest some because he really . . . my shop was looking pretty good with his income coming in.  And so I invested $30,000." |

1 TP 184:8-185:6

When then shown the Two Year Comparison Report page, Form 1040 that Bowden had produced in response to a subpoena duces tecum, and that the form indicated a business income for 1997 of $814, but a business income loss of $814 for

54

the year 1998, Bowden first tried to imply he had not provided that comparison report.

1 TP 187-191.  Eventually, Bowden testified

| Def.'s Counsel: | But we have page 6 from Form 1040, which is a two-year comparison report as you testified, correct, you listed a total of $814 in business income for $1997 and zero for $1998. |
| | Is that correct? |
| Bowden: | That's what it looks like.  I was having surgery during that time so it dropped down to almost zero. |

1 TP 191:20-25

Government counsel then queried Bowden concerning some of the transactions listed on the US Bank Statement for the Consanguis Education Group dated January 31, 2001.  1 TP 200.  Bowden testified that although he did not remember what the two check transactions shown on the statement were for, he testified that "the only checks he wrote on that account was for [Global Prosperity], something to do with that." *Id.* 200:11-14.  When queried whether he remembered any of the transactions that occurred during the months for which there were no statements, between March 1999 until 2001, Bowden testified:

| Gov't Counsel: | Do you recall any - - just from your memory? |
| Bowden: | Only one big investment with money that went in. |
| Gov't Counsel: | What was that? |
| Bowden: | That was 85,000, I think. |
| Gov't Counsel: | What happened to the money? |
| Bowden: | Well, it went gone. |
| Gov't Counsel: | What do you mean by "gone"? |
| Bowden: | It went to an investment of theirs.  From the Cancun trip one of the investments that he had there.  I invested into that.  It's, you know, they said it's gone.  They lost it. |

1        They – phone e-mails that you get.

2 1 TP 201:16-25.

3    Bowden testified that he first invested $30,000 for which he was reimbursed, and

4 then a check for $85,000, which was lost.  1 TP 205:25-206:1.  Bowden testified that

5 although he did not remember to whom exactly he wrote the two checks from the

6 Consanguis account:

7   Bowden:   I bought a bunch of books at one time, then I bought a

8          bunch of tapes and I might have wrote it to either Mike

9          Fitzpatrick or somebody in Global Prosperity.

10  Def.'s Counsel: Could it have been the Global 2001 12 tape audio series?

11  Bowden:   Could have been.  I don't know.  I would have to - - you

12         know, I could find - - you know, if I could find them

13         checks.

14  Def.'s Counsel: Do you recall giving the 12 tapes for the Global 2001

15         audio seminar to Special Agent Hardaway with the other

16         documents you gave him of your personal stuff?

17  Bowden:   I gave him some tapes.  I don't know how many.

18 1 TP 207

19      **3. SA Hardaway's Testimony**

20    SA Hardaway testified that Bowden gave him some documents on May 27, 2003,

21 the day of Laura Struckman's trial.  2 TP 305:24.  However, SA Hardaway testified that

22 he does not remember receiving documents from Bowden that Bowden had said he had

23 taken and photocopied from defendant's cars:

24  SA Hardaway: I don't remember him offering documents that he copied

25         at Dave's cars.  And I don't have any records.  I have no

26         recollection of receiving any of those records.

27    When asked about Bowden's testimony before the grand jury that indicted Laura

28 Struckman, SA Hardaway testified as follows:

| | | |
|---|---|---|
| Def.'s Counsel: | Did you prepare Mr. Bowden for his testimony before that grand jury? | |
| SA Hardaway | I don't know that I did.  Probably more the attorneys. | |

2 TP 308:4-6.

According to SA Hardaway, he first became aware that Bowden received an audit notice when Bowden called him sometime in 2004.  *Id.* 309:16-23.  SA Hardaway testified that Bowden expressed concern that the revenue agent would want to look at the documents Bowden had given SA Hardaway.  *Id.* 310:1-4.  According to SA Hardaway, he remembers Bowden telling him that Bowden had given Hardaway's information to the revenue agent, explained "a little bit of the background and history." *Id.* 310:6-10.  When asked about the conversation with the revenue agent, SA Hardaway testified:

| | |
|---|---|
| SA Hardaway: | I just recall making some, you know, admonitions.  This is a grand jury case.  Grand jury cases, obviously there is information which cannot pass, which we cannot share.  It's kind of, you know, some things we can and some things we can't.  Not a whole lot of information passed. |
| Def.'s Counsel: | What do you mean by that? |
| SA Hardaway: | Well, I mean the call was so quick I can't remember the fellow's name.  I recall that he said something that, you know, Bowden got caught up in some kind of a project.  I assumed it  had something to do with his being involved in Global, maybe trusts, offshore credit cards, and said something about not really being too excited about the case or the potential of the case from his viewpoint. |
| Def.'s Counsel: | Did you ever vouch for Dave Bowden's honesty or integrity with the revenue agent? |
| SA Hardaway: | That's possible.  You know, I found - - I have found |

1                          Dave Bowden to be fairly pretty straightforward.

2   2 TP 310:16-311:11.

3   Def.'s Counsel:        What would the purpose of that statement be?

4   SA Hardaway:           I would have to  - - I would have had to have heard what

5                          kind of context it was.  I mean - -

6   Def.'s Counsel:        The context of speaking to a revenue agent that was

7                          auditing someone who was providing information in a

8                          criminal investigation.

9   SA Hardaway:           He may have asked me, you know, what I thought of

10                         him.  Just as I said earlier, I mean, I've always found

11                         Dave Bowden to be, you know, an honest fellow.

12  Def.'s Counsel:        Do you recall confirming for the revenue agent in the

13                         Bowden audit that Dave Bowden wound up his trust in

14                         1999, closed them down? Do you recall telling him that?

15  SA Hardaway:           No

16  Id. 312: 8-20

17          When asked about the May 2, 2007 court order granting defendant's motion to

18  compel *Brady/Giglio* material as to Bowden, SA Hardaway evaded a clear answer, 2 TP

19  313:5-315:17, until:

20  Def.'s Counsel:        How did [the existence of the audit] come up?

21  SA Hardaway:           It was just a conversation.  Mark Odulio was there.  I

22                         think he went down to talk to Mr. Wszalek.

23  Def.'s Counsel:        Out of which man in that conversation did the words

24                         come out that Dave Bowden had been audited?

25  SA Hardaway:           I'm the one that brought it up.

26  Def.'s Counsel:        There we are.

27  SA Hardaway:           Yes.

28  2 TP 315: 18-25

| | | |
|---|---|---|
| 1 | SA Hardaway: | . . . When this issue came to the forefront I had - - we |
| 2 | | were all sitting down and I said, It's my recollection that |
| 3 | | -- that this is out.  We've talked about this before.  And |
| 4 | | that is - - that is my understanding.  It's my recollection |
| 5 | | that the issue of the audit of Dave Bowden had been |
| 6 | | talked about previously. |
| 7 | *Id.* 316:7-12 | |
| 8 | Def.'s Counsel: | On the most recent occasion that you told the prosecuting |
| 9 | | attorneys that Bowden had been audited, what was their |
| 10 | | response to that? |
| 11 | . . . . | |
| 12 | | Let's start with Mr. Wszalek. |
| 13 | SA Hardaway: | It seemed like it came out of left field.  He didn't seem to |
| 14 | | have a recollection. |
| 15 | Def.'s Counsel: | What was his recollection when you advised him that you |
| 16 | | had previously told him about the Bowden audit? |
| 17 | SA Hardaway: | You know, he wasn't particularly surprised, shocked.  He |
| 18 | | didn't have much of a reaction, to be honest with you. |
| 19 | Def.'s Counsel: | Did he say, Oh, gee, Mike, sure I remember that?  Is that |
| 20 | | something he said? |
| 21 | SA Hardaway: | No. |
| 22 | Def.'s Counsel: | What did he say? |
| 23 | SA Hardaway: | He seemed to be having a struggle. |
| 24 | Def.'s Counsel: | He was struggling? |
| 25 | SA Hardaway: | Yeah, with trying to remember. |
| 26 | . . . . | |
| 27 | | But you have to understand that, you know, a zillion facts |
| 28 | | have came (sic) across our screens.  And some take hold; |

| | | |
|---|---|---|
| 1 | | some don't. |
| 2 | Def.'s Counsel: | . . . What was Mr. Wszalek's reaction when you advised |
| 3 | | him that not only had you previously advised him that |
| 4 | | Bowden had been audited but that you had contact with |
| 5 | | the revenue agent who audited Dave Bowden? |
| 6 | SA Hardaway: | Well, regarding contact of the revenue agent, he wasn't |
| 7 | | happy about that. |
| 8 | Def.'s Counsel: | Was he struggling with that as well? |
| 9 | SA Hardaway: | No. |
| 10 | Def.'s Counsel: | Did he remember you advised him of that fact? |
| 11 | SA Hardaway: | No, I don't believe so. |

2 TP 317:5-318:21

SA Hardaway went on to testify that the statements attributed to him in the May 3, 2007 letter from the prosecutors to defendant's counsel, Def.'s Ex. 88, had been made based on the conversation that the prosecutors had with SA Hardaway, and that SA Hardaway had made those representations to the prosecuting attorneys.  2 TP 318:23-320:19.

SA Hardaway was then asked about his May 4, 2007 MOI concerning his contacts with the revenue agents conducting the civil audit on Bowden.  2 TP 321.  SA Hardaway testified that although Bowden had not asked him to do any favors, SA Hardaway had "cautioned him about his witness status and that it would not be proper for SA Hardaway get involved or do Bowden any favors." *Id.* SA Hardaway testified that he had made those statement to Bowden [b]ecause [he] was aware of how it would look.  *Id.* 322:3.  According to SA Hardaway, he cautioned Bowden because:

| | | |
|---|---|---|
| 25 | SA Hardaway: | Well, the revenue agent might interpret it that way. |
| 26 | Def.'s Counsel: | Did you think Bowden was thinking you would do him |
| 27 | | favors, that is why you made that statement? |
| 28 | SA Hardaway: | Favor might be a strong word. |

| | | |
|---|---|---|
| 1 | Def.'s Counsel: | Give me a word that works better. |
| 2 | SA Hardaway: | I got the feeling that Dave thought I could intercede for |
| 3 | | him. |
| 4 | Def.'s Counsel: | In fact, didn't he expect you to intercede for him? |
| 5 | SA Hardaway: | No, I wouldn't say that. |
| 6 | Def.'s Cousnel: | If you were so concerned about perception, why did you |
| 7 | | call the revenue agent in the first place?  Why didn't you |
| 8 | | just not do it? |
| 9 | SA Hardaway: | It's my recollection he called me. |

10  2 TP 323:2-14.

11      SA Hardaway was then asked to refer to his May 4, 2007 MOI where he stated:

| | | |
|---|---|---|
| 12 | SA Hardaway: | "Special Agent Hardaway's recollection is that the |
| 13 | | revenue agent subsequently telephoned Special Agent |
| 14 | | Hardaway and left a message and that Special Agent |
| 15 | | Hardaway returned his telephone call but it is possible |
| 16 | | Special Agent Hardaway telephoned the revenue agent. |

17  *Id.* 324:3-7

| | | |
|---|---|---|
| 18 | Def.'s Counsel: | All right.  You testified previously you were concerned |
| 19 | | with the perception of your having any contact with the |
| 20 | | Bowden auditors; is that correct? |
| 21 | SA Hardaway: | Not perception of contact.  I don' t want anybody |
| 22 | | thinking I was trying to play some sort of undue |
| 23 | | influence on anything. |
| 24 | Def.'s Counsel: | Is that the product of a guilty conscience? |
| 25 | SA Hardaway: | No, it's a product of a careful person. |
| 26 | Def.'s Counsel: | If you were so concerned about that, why didn't you |
| 27 | | record the memorandum of investigation or a |
| 28 | | memorandum of activity regarding these innocent |

1                         contacts?

2    SA Hardaway:       I've asked myself that same question a few times.

3    Def.'s Counsel:     I'll bet.

4    SA Hardaway:       At the time I thought I was doing everything exactly as

5                         somebody would recommend I do it.

6 *Id.* 324:11-25.

7    Def.'s Counsel:     Did you ever have a personal meeting with the revenue

8                         agent who audited Dave Bowden?

9    SA Hardaway:       I understand that I did, but I don't recall the meeting.

10                        I've been told that I did.

11    Def.'s Counsel:     Who told you that?

12    SA Hardaway:       I'm not sure.

13    . . . .

14    Def.'s Counsel:     So you couldn't remember that you had a personal

15                        meeting with this Bowden revenue agent on May 4 when

16                        you drafted this memorandum of activity?

17                        Do you suffer from a defective memory?

18    SA Hardaway:       Not generally.  My memory is pretty good.  Quite good,

19                        usually

20 *Id.* 327:4-25

21    Def.'s Counsel:     As you sit here today you do not recall the revenue agent

22                        driving to your Everett office and meeting with you for

23                        about six hours to discuss and review documents in the

24                        Bowden audit?

25    SA Hardaway:       No, I don't.

26    . . . .

27    Def.'s Counsel:     Do you recall ever providing documents to the Bowden

28                        revenue agent that Dave Bowden had given to you to

1    review?

2    SA Hardaway:      I don't recall.

3    Def.'s Counsel:   Do you recall giving any bank statements or other

4                      financial records to the revenue agents who audited Dave

5                      Bowden.

6    SA Hardaway:      No.

7    2 TP 328-329.

8    Def.'s Counsel:   Do you recognize this document that has been marked as

9                      Defendant's 50(b) 00113?

10   . . . .

11                     How do you recognize this document?

12   SA Hardaway:      I think it was in the box of records that Dave Bowden

13                     turned over to me.

14

15   Def.'s Counsel:   Do your recall whether you provided this document for

16                     review to the Bowden revenue agent that audited him?

17   SA Hardaway:      I do not recall that.

18   2 TP 329.

19        SA Hardaway was then asked about the timing of his first contact with Bowden.

20   According to SA Hardaway, he first met Bowden when he went to Bowden's house on

21   18613 108th Avenue Southeast, Renton, Washington 98055.  2 TP 330.  According to

22   SA Hardaway, SA Hardaway obtained the address by doing a real estate search for the

23   name that appeared on a check from Struckman to Bowden.  *Id.* According to SA

24   Hardaway's testimony, he met Bowden at Bowden's house at the 108th Avenue address

25   twice, first on December 21, 2002 and then January 16, 2003. *Id.* 330-31.  When shown

26   a recorded statutory warranty deed showing that the 108th Avenue house had been

27   conveyed by the Bowdens to a Timothy B. Isley on December 4, 2002, Def.'s Ex. 218,

28   SA Hardaway could not explain the contradiction. *Id.* 333.  Similarly, when shown a

declaration signed by Mr. Isley stating that Bowden "did no longer reside at the address [in question] after the property was conveyed to [Mr. Isley's] ownership," SA Hardaway could not explain the contradiction.[15]  *Id.* 334, referencing Def.'s Ex. 218

On cross-examination, government counsel asked SA Hardaway to expand upon his prior testimony.

| | | |
|---|---|---|
| Gov't Counsel: | When you answered counsel and said that you were concerned about the perception of undue influence, what did you mean? |
| SA Hardaway: | Well, I was concerned about how any contact with the revenue agent might look.  But I was also concerned about what - - I was also concerned about how Mr. Bowden himself would perceive it.  I can only speculate as to exactly what Mr. Bowden's state of mind was. |
| Gov't Counsel: | I don't want you to speculate to that. |
| SA Hardaway: | I understand.  I think, as I responded earlier, I suspected and I didn't want it to appear - - I was worried about how it may look. |

2 TP 336

## C. Documents from Defendant's cars

Defense counsel then queried SA Hardaway about documents Bowden had testified he had taken and copied from defendant's cars.

| | | |
|---|---|---|
| Def.'s Counsel: | Did there come a time when you received documents from Dave Bowden that he indicated he had taken and photocopied from David Struckman's cars? |

---

[15]  Government counsel attempted to explain the contradiction by pointing to a discrepancy in the zip codes. However, a computer search for a map of the address with the different zip codes reveals the same location.

| | | |
|---|---|---|
| 1 | SA Hardaway: | No, I don't remember that at all. |
| 2 | Def.'s Counsel: | That never happened? |
| 3 | SA Hardaway: | I don't remember him offering documents that he copied |
| 4 | | at Dave's cars.  And I don't have any records.  I have no |
| 5 | | recollection of receiving any of those records. |

2 TP 306:3-10.

***Analysis***

## I.    Jurisdiction

Defendant argues this court does not have jurisdiction over the defendant because the government fabricated a deportation of defendant from Panama so as to sidestep the provisions of the treaty between the United States of America and the Republic of Panama, Providing for the Extradition of Criminals, May 25, 1904, 34 Stat. 2851; T.S. No. 445 ("the Treaty").  The defendant argues that because the crime of fraud on the government is not an extraditable crime under the Treaty, prosecution of the defendant in the United States would be barred by the principles of dual criminality and specialty.[16]

In general, the means used to bring a criminal defendant before a court do not deprive that court of personal jurisdiction over the defendant. *United States v. Alvarez-Machain*, 504 U.S. 655, 661-62 (1992) (*citing* and *quoting Ker v. Illinois*, 119 U.S. 436 (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952). The *Ker/Frisbie* doctrine does not apply, however, and a court is deprived of jurisdiction over an extradited defendant,

---

[16]  "Dual criminality requires that an accused be extradited only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations. . . . The doctrine of specialty provides that it is impermissible to try a defendant other than for the crimes for which he has been extradited."  *Anderson*,  472 F.3d at 670 -71 (internal citations omitted).

1   if either: (1) the transfer of the defendant violated the applicable extradition treaty, or

2   (2) the United States government engaged in "misconduct 'of the most shocking and

3   outrageous kind'" to obtain the presence of the defendant to face trial.  *United States v.*

4   *Anderson,* 472 F.3d 662, 666 (9th Cir. 2006) *citing* and *quoting United States v.*

5   *Matta-Ballesteros*, 71 F.3d at 762-64 (*quoting United States v. Valot*, 625 F.2d 308, 310

6   (9th Cir.1980)).

7          Under *Alvarez-Machain*, a challenge to personal jurisdiction begins with the

8   express terms of the applicable extradition treaty.  *Anderson*, 472 F.3d at 666.  The court

9   concurs with the analysis in other circuits that "nothing in [the treaty between the United

10  States and the Republic of Panama] suggests that the countries involved must follow the

11  extradition procedures set out in the treaties when they return criminal defendants to the

12  United States."  *United States v. Cordero,*  668 F.2d 32, 37 (1st Cir. 1981).  As other

13  courts have held, "[n]othing in the treaty prevents a sovereign nation from deporting

14  foreign nationals for other reasons and in other ways should it wish to do so." *Id.*

15         Defendant argues that because defendant was deported at the request of the U.S.

16  government, the deportation of the defendant was a 'ruse' created to avoid the

17  limitations of the Treaty.  However, "where no demand for extradition is made by the

18  United States and the defendant is deported by the authorities of the other country which

19  is party to the treaty, no 'extradition' has occurred and failure to comply with the

20  extradition treaty does not bar prosecution." *United States v. Valot*,  625 F.2d 308, 310

21  (9th Cir. 1980).

22         Although here the U.S. government worked assiduously, to say the least, to assist

23  the Panamanian authorities in determining the whereabouts of defendant, ultimately, the

24  decision to deport defendant from Panama was within the prerogative of the

25  Panamanian authorities.

26         Defendant would like this court to challenge the interpretation of Panamanian law

27  by Panamanian authorities, and argues that Panamanian authorities misapplied Article

28  36 and 37 of the Law Decree No. 16 of June 30, 1960 to David Struckman.  Under the

act of state doctrine, however, the court declines to second guess the interpretation by a sovereign nation of its own law. "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Liu v. Republic of China*, 892 F.2d 1419, 1431-32 (9th Cir. 1989) citing *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 691 n. 7 (1976) (*quoting Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).  Thus, the court will not interfere with Panama's decision to deport David Struckman to the United States.

**II.  Defendant's Motions to Dismiss**

Defendant moves to dismiss the indictment with prejudice on four grounds (1) Government misconduct in obtaining defendant's presence to stand trial, (2) unnecessary delay in bringing the defendant to trial, (3) government misconduct in connection with Anonymous Informant No. 1, and (4) government misconduct in connections with Dave Bowden.[17]

**A. Panama and Unnecessary Delay**

*1. Government misconduct in obtaining defendant's presence to stand trial*

A court may use its inherent supervisory powers to dismiss a prosecution (1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct. *United States v. Matta-Ballesteros*, 71 F.3d 754, 763 (9th Cir. 1995).

The defendant argues he was deprived of his right to counsel when Regional Security Officer Timothy O'Brien interfered with defendant's ability to meet with his

---

[17]  Although in his brief defendant had also argued the government had abuse the grand jury process, defendant failed to present any support for that allegation at the evidentiary hearing.  Therefore, the court denies defendant's motion to dismiss as to that argument.

counsel and with his due process rights to challenge his deportation from Panama.[18]

While the court does not condone the government's actions in procuring the defendant's presence to stand trial, defendant forgets that the Panamanian government's decision to deport defendant preceded any interference with defendant's communication with counsel.

Defendant Struckman was ordered deported on August 25, 2004 through Resolution Number 10886, the same day his application to change his tourist visa to an investor visa was denied through Resolution Number 10885.  Under the latter Resolution, defendant Struckman was given a minimum of three days and a maximum of thirty days to leave Panama.  Defendant has failed to show he did not receive proper notice of either the deportation resolution or the resolution denying his request for an investor visa.[19]  Therefore, defendant has failed to show that by the time he was detained under Detention Number 0036 on January 12, 2006, he still had any viable rights, under Panamanian law or otherwise, to challenge his deportation order.

Second, defendant argues that what he calls a "*de facto* extradition disguised as a deportation" constitutes a *jus cogens* violation giving the court the discretionary authority to dismiss the indictment.[20]  Defendant's argument is premised on the notion

---

[18]  The defendant also alleges RSO O'Brien violated Article 36 of the Vienna Convention by preventing the United States Consulate from being notified of defendant's arrest.  Assuming the obligation to notify the U.S. Embassy fell on RSO O'Brien, rather than the Panamanian authorities, the remedy for such a violation is uncertain.  *See Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669 (2006); *Avena and Other Mexican Nationals* (Mex. v. US.), 2004 I.C.J. 128 (Mar. 31).

[19]  Although Attorney Millwood testified that he had not seen Resolution 10886 before, there is no evidence on the record that Struckman himself had not been notified before January 13, 2006 of the August 25, 2004 deportation resolution.

[20]  The Vienna Convention on the Law of Treaties defines *jus cogens* as "a norm accepted and recognized by the international community of states as a whole as a norm from which no

1   that defendant's deportation from Panama was illegal notwithstanding the decision of

2   the Supreme Court of Justice of the Republic of Panama to the contrary.  For the same

3   reasons as above, this court refuses to second guess the findings of a Supreme Court of a

4   sovereign nation.

5          Defendant next argues that the actions of RSO O'Brien are so offensive that they

6   constitute a violation of due process.  Although the court is disturbed by the conduct of

7   the government, "less-than-exemplary conduct of the government, sleazy investigatory

8   tactics alone--unless so offensive that they amount to a violation of due process--do not

9   provide the "clear basis in ... law required for the exercise of the supervisory power.

10  Unless the law enforcement officers break the law, the court has no authority to sanction

11  them."  *United State v. Simpson*,  927 F.2d 1088, 1090 (9th Cir. 1991).

12         In *Simpson*, after receiving a tip that Darrel Simpson was suspected of being an

13  international drug smuggler, FBI agent Hamer began an investigation with the

14  assistance of Helen Miller as an informant.  *Id.* at 1089.  "Miller was a prostitute, heroin

15  user and fugitive from Canadian justice; but otherwise she was okay." *Id.*  Hamer sent

16  Miller to meet up with Simpson, whereupon  Simpson and Miller developed a " sexually

17  and emotionally intimate relationship of some duration." *Id.*  At Miller's request or her

18  prompting, Simpson procured heroin.  *Id.*  Miller then introduced Simpson to Hamer,

19  who then made several purchases.  *Id.*  Simpson was then arrested. *Id.* "Throughout the

20  investigation, Miller engaged in pastimes unbecoming someone on the federal payroll:

21  prostitution, heroin use and shoplifting.  In addition, the FBI allowed Miller to keep a

22  $10,000 profit from one of the heroin sales she arranged."  *Id.*  Finding that law

23  enforcement had not broken any law, the Ninth Circuit reversed the lower court's

24

25  ─────────────────────

26  derogation is permitted and which can be modified only by a subsequent norm of general

    international law having the same character." *Siderman de Blake v. Republic of Argentina*,  965

27  F.2d 699, 714 -715 (9th Cir. 1992) *citing to* Vienna Convention on the Law of Treaties, art. 53,

28  May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679.

1  decision to dismiss the indictment based on its supervisory powers.  *Id.*  at 1090.

2      Here, while the contempt for the sacred tradition of *habeas corpus* that RSO

3  O'Brien exhibited in his communications with Department of Justice officials, how ever

4  foolish and ill advised, does not violate the law.  Although he misrepresented

5  defendant's status as an already sentenced individual who was a fugitive from federal

6  authorities and was awaiting to serve his sentence,[21] his lies post dated Resolution 10866

7  ordering Struckman to be deported.  Similarly, RSO O'Brien's letter to Licenciado

8  Gustavo A. Perez A., dated August 1, 2005 claiming defendant was charged with

9  "defrauding investors of over $50 million" and accusing defendant of perpetuating the

10  "same kind of fraud scheme that he used with such success in the U.S." post dates the

11  deportation Resolution by over a year.

12      Because RSO O'Brien broke no law, the court has no authority to sanction the

13  government for O'Brien's activities.[22]

14      While courts may exercise the supervisory power to " preserve judicial integrity"

15  by ensuring that a conviction rests on appropriate considerations, courts have interpreted

16  this power as substantial discretion over "what happens inside the courtroom."

17  *Simpson*,  927 F.2d at 1091 *citing United States v. Schwartz*, 857 F.2d 655, 660 (9th Cir.

18  1988) (Hupp, J., concurring).  As none of the actions concerning defendant's removal

19  happened inside the courtroom, such actions are not a proper basis for the court's use of

20  its supervisory power to preserve judicial integrity.

21      A court may also use its supervisory power to deter future illegal conduct.

22  Having found no illegal conduct by the U.S. government in Panama's decision to deport

23  _____

24      [21] RSO O'Brien's attempts to pretend he did not understand the Spanish version of his

25  own letter dated January 11, 2006 were less than credible.

26      [22] Had there not been a valid deportation Resolution which the Supreme Court of Justice

27  of Panama found to have been properly issued, and had there been evidence that Struckman had

28  not been notified of the August 25, 2004 resolution, the repercussions of RSO O'Brien may have

been different.  That issue, however, is not before the court.

1   defendant, the court finds no illegal conduct that need be deterred.[23]

2          *2. Unnecessary Delay*

3          Defendant argues that the indictment should be dismissed, with prejudice,

4   because the delay was caused by the intentional withholding of Bowden's audit file

5   pursuant to Federal Rlule of Criminal Procedure, Rule 48(b)(3).

6          Under Rule 48(b), "if there is unnecessary delay in bringing a defendant to trial,

7   the court may dismiss the indictment."

8          Court have emphasized, however, that "although the rule confers discretion upon

9   the district judge, a Rule 48(b) dismissal 'should be imposed only in extreme

10  circumstances.'  That is especially true when a dismissal is with prejudice." *United*

11  *States v. Yuan Qing Jiang*, 214 F.3d 1099, 1101 (9th Cir. 2000) (internal citations

12  omitted).  Because dismissal is considered severe, a district court abuses its discretion if

13  it imposes the sanction of dismissal without first satisfying the requirements of 'caution'

14  and 'forewarning.' *Id. citing United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 737-

15  38 (9th Cir.1989).   "The term "caution" is used "in a non-obvious, technical sense" and

16  "requires findings of prosecutorial misconduct and actual prejudice to the accused." *Id.*

17  *citing United States v. Huntley*, 976 F.2d 1287, 1292 (9th Cir.1992).

18         In *Yuan Qing Jiang*, the lead prosecutor left Guam for home leave in Minnesota.

19  214 F.3d at 1102.  Before the prosecutor left Guam, she consulted with the district

20  court's clerk and was told the cases would not proceed to trial until after her return.  *Id.*

21  However, the prosecutor failed to confirm such information with the district court itself,

22  nor did the prosecutor obtain confirmation in writing of such statements.  *Id.*  After the

23  prosecutor's departure, the court set trial for a date that would occur before lead counsel

24  was scheduled to return.  *Id.*  When the new prosecutor represented that the government

25

26         [23]  Although defendant argues the revocation of his passport was illegal because the

27  government failed to provide him notice of his right to appeal such decision, defendant fails to

28  show why dismissal of the indictment would be a proper remedy.

1  was unprepared to go to trial without the lead prosecutor, the court denied a motion to

2  continue the trial and dismissed the case with prejudice. *Id.*  On appeal, the appellate

3  court assumed that the lead prosecutor's failure to obtain written confirmation of a new

4  trial date and the failure of the government to provide a lawyer to commence trial on the

5  set date, constituted prosecutorial misconduct sufficient for a dismissal without

6  prejudice.

7        Although, as described below, the court does find that SA Hardaway prevented

8  the prompt disclosure of the audit file, unlike *Yuan Qing Jiang*, the court does not find

9  that the prosecutors were involved in that delay.  While the prosecutors were negligent

10  in their analysis of the IDRS form, as soon as they realized their mistake, the

11  prosecutors informed the court.  Furthermore, as soon as they realized that SA

12  Hardaway had previously mentioned the audit, and as soon as SA Hardaway disclosed

13  the extent of his contacts with the revenue agent, the prosecutors informed defense

14  counsel.

15        While the prosecutors may be blamed for faulty memory, it is likely they did not

16  remember SA Hardaway had mentioned the audit before the court granted defendant's

17  motion to compel.  Unaware of the extent of SA Hardaway's involvement with the

18  revenue agents, it is likely the fact an audit took place was not foremost in their minds.

19  Finding no prosecutorial misconduct, the court need not analyze defendant's claim of

20  actual prejudice.

21     **B. *Brady/Giglio* Violations.**

22        "The suppression by the prosecution of evidence favorable to an accused upon

23  request violates due process where the evidence is material either to guilt or to

24  punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v.*

25  *Maryland,*  373 U.S. 83, 87 (1963).

26     *3.  Misconduct in connection with Anonymous Informant No. 1*

27        The court does not take allegations of government misconduct lightly.  After

28  examining the record to ensure defendant's accusation withstood close scrutiny,

however, the court is left with no recourse but to conclude that Gary Moritz cannot be the source of all the information attributed to him.

Here, the sheer volume of discrepancies in the testimony of the agents who claim to have handled the informant, the degree of irregularities in the record concerning the alleged informant, as well as the uncontested testimony of two declarants testifying that Gary Moritz could not have been the informant, lead the court to find that there was no single source of information for all the information attributed to Ted, and that the source of all that information could not have been Gary Moritz.

Of the twelve contacts for which Chinn produced rough notes dated before the March 14, 2001 e-mail, MOIs were prepared dated after the March 14 e-mail for seven of those contacts, with dates from March 27, 2001 through April 1, 2001.[24]

Only four MOIs were produced on the same day as the rough notes indicate the contacts took place.[25]  Of this set, the MOI produced on January 25, 2001 remarkably departs from the originating rough notes.  Whereas there are two different sets of rough notes for the January 25, 2001 contact, only one MOI was produced, that which was signed by SA Chinn.  Out of sixteen sentences written in the rough notes resembling SA Chinn's handwriting, SA Chinn's MOI attributes only two pieces of information to Ted: that Laura J. Struckman was then living in Hawaii and had purchased an embroidery business in Lahaina, Maui; and that Struckman was working for ProStep and getting $25,000/month.  Although the handwriting on the second set of notes resembles that of SA Hardaway and although SA Hardaway's Agent Diary indicates he met with an anonymous source, SA Hardaway did not produce a MOI for this date.

[24]  MOI for the rough notes dated September 13, and 21 were prepared on March 27 and 28, 2001.  MOI for the rough notes dated November 8, 13, 15, were prepared on March 29, 2001. MOI for the rough notes dated November 20 and 27 were prepared on March 30, 2001 and April 1, 2001, respectively.

[25]  MOI for rough notes dated September 15, November 30, December 11, 2000 and January 25, 2001.

Not only does the January 25 contact follow the January 11 e-mail from SA Holm requesting more information in preparation for the upcoming search warrant affidavit, but more tellingly, the rough notes reflect the type of information SA Holm identified as "still need[ing]" from SA Hardaway.

In addition, MOIs from the rough notes dated September 18, 2000 and November 20, 2000 were prepared on January 28, 2001 and March 30, 2001, respectively. Although neither of these two rough notes reference "Ted," the later produced MOIs attributed the information to Ted.  Among the information now attributed to Ted is information concerning a bank account at Chase Manhattan, that "Ted somehow got the password into the website and went behind the net," and that a Jennifer Struckman had been followed by a "white van."  All other rough notes explicitly reference Ted.

Although both SA Hardaway and Chinn testified that but for two occasions Ted always initiated the contact by phoning the agents, Ted phones the Agents when the agents needed him the most.  After SA Chinn announces on August 7 that he needs personnel for surveillance with "high priority as we need pc for the anticipated warrants," Ted calls SA Chinn anonymously at Chinn's place of employment. 1 TP 264:11-16.  According to SA Chinn, the anonymous caller had "gotten wind that Dave [the defendant] was under investigation and that he had some information for [SA Chinn]."  *Id.*  Similarly, when the agents need information for a search warrant affidavit, and after SA Hardaway informs SA Chinn that SA Hardaway "has yet to see anything regarding the extensive surveillance activity" concerning Struckman, Ted either calls both SA Hardaway and Chinn simultaneously on January 25, 2001, or the agents meet him in person.[26]  If the meeting was in person, there is no indication where the meeting

---

[26] During the evidentiary hearing, Chinn states:

Counsel:    How many contacts did you have with Ted subsequent to
            the September 13, 2000 personal meeting?

SA Chinn:   Contacts telephonically or personally?

took place.

Although both SA Chinn and Hardaway testified that they had no way of contacting Ted, the informant appears at the most propitious times for the investigators: less than a month after SA Chinn announces surveillance activities on Struckman will commence because they need probable cause for the upcoming search warrants, and when SA Holm tells SA Hardaway he needs more information for the search warrant affidavit.

The type of information attributed to Gary Moritz, the husband of a previous wife of Struckman who divorced Struckman over fifteen years before Struckman's involvement with Global, does not fit with the description of Gary Moritz' relationship with Struckman nor with Struckman's daughters.  Gary Moritz, according to the government, knows bank account numbers and addresses of the banks where defendant allegedly has accounts; Social Security Numbers for Laura Struckman, Jacob Wininger, Jennifer Wininger, Mike Bovee, married to Rachel, and even Jacob's mother; the lawyer Struckman was thinking about hiring for his grand jury appearance, Jennifer's marital troubles, Ms. Mollenberg's and Struckman's whereabouts in Panama, the structure of Global Prosperity and names of trusts defendant was suspected of using. Although Bonnie Moritz' testimony may be biased and could be the result of trying to protect her daughter, Jennifer, the government forewent the opportunity to impeach both Mrs. Moritz and Jennifer Wininger by choosing not to cross examine them.   Bonnie Moritz' declaration is also supported by Jennifer's declaration.

Although alleged contacts with Ted occurred sometimes every other day in the

---

| | |
|---|---|
| Counsel: | Both. |
| SA Chinn: | One personally.  Maybe - - maybe another occasion we had a personal meeting with Ted with another - - with Agent Hardaway, I believe.  And then subsequently it was always Ted calling me. |

1 TP 276-78.

1   months leading to the search warrants, the contacts subside after the warrant is executed
2   but increase around the time of Struckman's grand jury appearance.

3       Although there are no MOIs memorializing contacts with Ted after December 12,
4   2001, the government nonetheless attributes information to Ted as to Struckman's
5   whereabouts in Panama.

6       Although SA Chinn had apparently done extensive surveillance on Struckman,
7   when SA Hardaway reviews the file on or about December 11, 2000, SA Hardaway
8   "has yet to see anything" regarding such surveillance.

9       Although both Chinn and Hardaway testified that they learned Ted was Gary
10  Moritz by running his vehicle identification number soon after the first meeting, both
11  agents conveniently neglected to mention that fact in their first two submissions to the
12  court asserting Ted was Mr. Moritz.

13      While SA Maning testified that he saw SA Chinn with an alleged informant, and
14  that he took down the informant's vehicle number, he stopped short of saying he
15  remembered giving the number to SA Chinn.  SA Maning testified he himself had not
16  run the vehicle number himself.

17      In spite of the amount of information provided by the informant, in spite of an e-
18  mail from their supervisor reminding them how to handle informants and asking them to
19  encourage Ted to become a confidential informant, and in spite of an instruction by the
20  government attorney reviewing the search warrant affidavit to indicate how the
21  informant came about his information, if known, neither SA Hardaway nor Chinn
22  produce any notes to indicate they attempted to obtain such information from the
23  informant.  It was only when the court explicitly asked for the basis of the informant's
24  knowledge that SA Hardaway and Chinn state that Moritz would say "the girls came by
25  the house," or that they thought Moritz had seen documents lying around at Jennifer's or
26  Struckman's residence.

27      Although it could have been a perfectly innocent error on their part, in spite of the
28  court's repeated requests for "declarations," SA Chinn and  Hardaway finally submitted

their declarations under penalty of perjury just days before the evidentiary hearing, and such declarations were remarkably different from their previous statements when it comes to details.  SA Hardaway, for example, no longer conclusively establish Ted's identity as Gary Moritz on January 16, 2003.  January 16, 2003 is incidentally now the date of a previously unknown interview of Bonnie and Gary Moritz by SA Hardaway, a meeting from which notes were revealed to defense counsel on February 23, 2007.[27]  SA Chinn resorted back to his first statement when he did not explicitly state Ted was Gary Moritz.

While the government tried to impeach Mr. Moritz, the court finds his lack of memory genuine.  By his demeanor, his obvious pain when unable to remember his own daughter's name, and by the look of bewilderment about him, the court finds Mr. Moritz' inability to remember whether or not he had provided the government with information concerning Struckman to be truthful. The court does not share the government's implication that Mr. Moritz was faking his condition.

While in isolation all these discrepancies could very well be attributed to sloppy record keeping, faulty memories, simple misstatements or minor omissions, in the aggregate, they add to nothing more than a house of cards built to support the illusion of the existence of Anonymous Informant No. 1.

The court thus finds that by suppressing the source of the information attributed to AI-1/Ted, information that would be material to a defense of government misconduct, the government has committed a *Brady* violation that would result in a due process violation at trial.

    *4.    Government misconduct in connections with Dave Bowden.*

The discrepancies concerning whether SA Hardaway interfered with the Bowden audit fare no better.

---

[27]  Curiously, such notes were not included in the government's September 30, 2005 *in camera* submission as to Jencks Act material.

1    In spite of the continuous request for *Brady/Giglio* material from the defense, SA

2    Hardaway does not find it necessary to remind the prosecutors Bowden had been

3    audited until the court's May 2, 2007 order granting defendant's motion to compel such

4    disclosure.  Not only did SA Hardaway fail to remind the prosecutors of the audit until

5    then, but he had apparently neglected to mention the extent of such contact.

6    Furthermore, when he does tell the prosecutors about the "one-contact" with the revenue

7    agent and although on his May 4 MOI SA Hardaway extensively narrates all the

8    disclaimers and admonitions he gave to Bowden and the revenue agent, somehow SA

9    Hardaway does not remember he personally met with RA Battaglino, nor that he

10   provided RA Battaglino with the documents Bowden had entrusted to SA Hardaway.

11   The court simply finds it unbelievable that, on the one hand SA Hardaway is so

12   concerned about the perception of improper interference with an audit and on the other

13   hand, SA Hardaway forgets that the revenue agent had not one, but two appointments

14   with SA Hardaway.

15    The discrepancies between SA Hardaway's recollection of his contacts with the

16   revenue agents and those agents' notes are very telling.  While SA Hardaway claims he

17   admonished the revenue agent to do "his due diligence," the revenue agent writes

18   "called SA Hardaway - confirmed story."  While SA Hardaway claims he told the

19   revenue agent "not to base any decision or action on the fact that Bowden assisted the

20   government with a criminal investigation and trial," RA Battaglino writes: "The

21   taxpayer had testified against the promoters in the two Grand Jury and in one trial."

22    While RA Battaglino states that he specifically went to SA Hardaway's place of

23   employment to review the documents Bowden stated had been given to SA Hardaway,

24   SA Hardaway does not remember if he made any documents available to the revenue

25   agent, and if he did, what those documents may have been.  The revenue agent's notes,

26   by comparison, clearly state that not only SA Hardaway confirmed he had the

27   documents that Bowden was referring to, but that the revenue agent "was more than

28   welcome  to come look at them."

The gradual development of Bowden's statements concerning the extent of Laura Struckman's involvement in Struckman's enterprises and activities indicate a more than reasonable explanation for SA Hardaway's behavior concerning Bowden's audit.

While Bowden first said Struckman had talked him into investing $30,000.00, Bowden testified to the grand jury that Struckman had "let him ride along on his wife's investment that she put in so I could put it in on hers.  And she would just pay me out through that, through Laura Struckman." Def.'s Ex. 47at 13:22-25.

While in his first statement to SA Hardaway, Bowden states Struckman gave him the $30,000.00 check to reimburse him back for his loss, by the time Bowden testifies to the grand jury, both Laura and Struckman came up to him and gave him back the check.

While Bowden first stated Struckman talked about and frequently went to some sort of a safe deposit box or vault, at Laura Struckman's trial, Bowden testified that "they both mentioned that they did have a banking account or a safe deposit box."

Although Bowden told SA Hardaway that when he deposited the cash he had received from Struckman from the sale of the 1932 Plymouth the bank had generated a "currency transaction report," to the grand jury, Bowden testifies that "yeah.  See, I never knew nothing about that.  I never had $10,000 to put in there, so he told me that you would have to sign a form if you put in more than [$10,000]."

Bowden stated to SA Hardaway that he saw Laura Struckman at the bank nearly everyday withdrawing currency, and later added that Dave Struckman had told Bowden Struckman sent Laura Struckman to the bank nearly everyday to withdraw $9,000 or $9,500 in cash from the bank.  Upon being questioned by a grand juror, Bowden testified that Laura Struckman did not directly tell him about the $10,000 cash transaction forms, and that Dave had told him about the amount.  However, at trial, Bowden's recollection is that both Dave and Laura Struckman told him about the amount: "Well, yeah, during the conversations between her and Dave and me . . . they'd mention that they'd go down to the bank every day and get under $10,000 because the government wouldn't find out about it.  They wouldn't have to fill out some forms, or

1  something."

2    Although to SA Hardaway, Bowden states that David Struckman talked about

3  sending bulk cash shipments, at trial and upon being asked by government counsel if

4  Laura Struckman had told him anything about what they did with the money, Bowden

5  testified that "[t]hey said they were shipping out a hundred, two hundred thousand

6  dollars at a time in paper bags."

7    The court does not consider the changes in Bowden's testimony insignificant.  In

8  a case where a defendant was charged with knowingly, intentionally, and unlawfully

9  conspiring and agreeing to structuring, changes in testimony that satisfy such elements

10  become very significant.[28]

11    Although Bowden testified during the evidentiary hearing that he did not fear

12  prosecution for his involvement with Global Prosperity, his visible agitation when

13  shown his 97-98 two year income comparison report belied that statement.  Bowden

14  resented the fact that he had been found to have misstated his income to the grand jury

15  in comparison to what he had reported on his tax return form.  Bowden was so agitated

16  by the discovery that he went as far as to imply that the document had not come from

17  his own files in response to the defendant's subpoena duces tecum.

18    Not only was Bowden not prosecuted, but in return for his testimony in the Laura

19  Struckman trial, and in the upcoming trial of David Struckman, SA Hardaway prevented

20  a proper audit of Dave Bowden by the civil branch of the IRS.  SA Hardaway vouched

21  for Bowden's honesty and integrity to the revenue agents.  Although SA Hardaway

22  apparently had in his possession documents to the contrary, SA Hardaway confirmed to

23  the revenue agents that Bowden had ended his trust activities and had closed his trust in

24  1999.  While neither the bank statements showing bank activity in the name of the

25

26    [28] The court does not decide whether there was a *Brady/Giglio* violation in the Laura

27  Struckman case, only that the change in Bowden's testimony is meaningful for purposes of the

28  case in front of this court.

Consanguis Education Group as late as January 2001, nor the Agency Agreement dated the same year, nor the Global Prosperity 2001 course tapes constitute conclusive evidence of Bowden's continuous involvement with so called abusive trusts, their existence may have given a revenue agent pause to conclude the taxpayer involvement had ceased in 1999, and thus that his activities did not fall within the statute of limitations, without further investigation.

While it may be a coincidence that the box of documents Bowden gave to SA Hardaway were simply kept out of the knowledge of the prosecutors, it is more likely that SA Hardaway was trying to maintain those records separate from the investigatory file in this case.

In order for the court to conclude there was no secret deal between SA Hardaway and Bowden, the court would have to explain away, let alone ignore, all the above discrepancies, contradictions and Bowden's changing testimony.  Given all this evidence, the court is compelled to conclude the government, in the person of SA Hardaway, has not disclosed its arrangement with Bowden.

The court thus finds that by suppressing evidence tending to impeach a government witness, the government has committed a *Brady* violation, as extended by *Giglio v. United States*, 405 U.S. 150 (1972), that would result in a due process violation at trial. *See  United States v. Kojayan*, F.3d 1315, 1323-24 (9th Cir. 1993) ("where prosecutor knowingly uses perjured testimony, error is not harmless unless there is no reasonable likelihood that the misconduct influenced the verdict.") *citing United States v. Augurs*, 427 U.S. 97, 103 (1976).

In addition, the government has yet to produce the documents Bowden asserted, on numerous occasions and under different circumstances, he took and copied from defendant's cars.  Although the time frame of the taking has not been established, as recent as days before the evidentiary hearing, Bowden attempted to give yet another SA documents Bowden claimed belonged to the defendant.  When the SA did not take the document and photographs, Bowden asked if he would get in trouble for taking

documents out of defendant's cars.  Yet, SA Hardaway to this day denies he received

any documents from Bowden which Bowden claimed to have taken from defendant's

car.

When defense counsel demanded the documents Bowden testified he had given to

SA Hardaway, SA Hardaway happens to remember there was a box containing 'some'

documents which, for an unexplained reason, SA Hardaway kept separated from the file

in this case and of which the prosecutors were unaware.

Given that the government has yet to produce the documents Bowden took and

copied from defendant's cars, and given the pattern of misconduct in the case, the court

finds that the government should not be allowed to introduced those documents at trial.

## III.   Remedy

In general,  "remedies should be tailored to the injury suffered from the

constitutional violation and should not unnecessarily infringe on competing interests."

*United States  v. Morrison*, 449 U.S. 361, 364 (1981).

> Our approach has thus been to identify and then neutralize the taint by
>
> tailoring relief appropriate in the circumstances to assure the defendant the
>
> effective assistance of counsel and a fair trial. . . . The remedy in the criminal
>
> proceeding is limited to denying the prosecution the fruits of its
>
> transgression.

*Id.*

Here, the taint of the violation can be neutralized by excluding any evidence

attributed to AI-1/Ted; by excluding Dave Bowden as a witness against the defendant at

trial; and by excluding any evidence against the defendant that was procured from

defendant's car by Bowden and not already disclosed as such to the defendant.

Because trial has not occurred and the taint of the violation can be prevented, by

excluding the tainted evidence, thus preserving the defendant's right to a fair trial while

allowing the government to prosecute the accused, dismissal is not warranted.

*Morrison*, 449 U.S. at 366 n.3 *citing United States v. Blue*, 384 U.S. 251, 255 (1966).

1   Accordingly,

2   IT IS ORDERED that

3   (1) the government is precluded from introducing at trial any evidence previously

4   attributed to Anonymous Informant No. 1, also known as Ted, unless the

5   government shows an independent source for the information;

6   (2)  the government is precluded from introducing Dave Bowden as a witness

7   against the defendant at trial, and

8   (3) the government is precluded from introducing any documents obtained from

9   defendant's car by Bowden, unless already disclosed to the defendant as such.

10   IT IS FURTHER ORDERED that the government shall make a proffer before

11   introducing any evidence at trial to establish that the proposed evidence is not derived

12   from the suppressed evidence.

13   The government is HEREBY forewarned that the court may consider dismissing

14   the indictment with prejudice under Federal Rule of Criminal Procedure 48(b)(3) for

15   any further delay caused by the government's inability to comply with this order.

16

17   Dated: October 16, 2007

18

19

20   _____

21   ROBERT M. TAKASUGI
     United States District Sr. Judge

22

23

24

25

26

27

28